Anthony MATTIS, M.D., Plaintiff,

v.

UNITED STATES of America, and its Agents and Employees, Otis R. Bowen, Secretary, Department of Health & Human Services, and Edward D. Martin, M.D., Assistant Surgeon General, Director, Bureau of Health Care Delivery and Assistance, Health Resources and Services Administration, Public Health Service, Department of Health and Human Services.

No. C.A. 84–C–719.

United States District Court,
E.D. Wisconsin.

Sept. 16, 1986.

Terry E. Mitchell, Milwaukee, Wis., for plaintiff.

Joseph P. Stadtmueller, U.S. Atty. by Jan E. Kearney, Asst. U.S. Atty., Milwaukee, Wis., for defendants.

### Decision and Order

REYNOLDS, Senior District Judge.

The plaintiff, Dr. Anthony Mattis, had an agreement with the National Health Service Corps (NHSC) whereby the NHSC would finance part of Mattis' medical education and Mattis, in turn, would practice medicine for three years in a part of the country which was designated by the Department of Health and Human Services as a health manpower shortage area. The contract provided that Mattis was to pay the NHSC three times the amount of his scholarship if he failed to report to the area assigned to him. The government wanted Mattis to go to New Mexico. Mattis went to New York.

Mattis brings this action for declaratory judgment that he can practice in New York and not have to pay the government three times the amount of his scholarship. The court has jurisdiction pursuant to 28 U.S.C. § 1331. The defendants have moved for summary judgment. The facts set forth below are taken from the affidavits and supporting documents filed with the court by the parties. All reasonable inferences have been drawn in favor of the nonmoving party, the plaintiff.

### FACTS

Mattis applied for and received a NHSC scholarship for the 1978–81 school years. The government agreed to pay his educational expenses and provide him with a stipend while he was in school, and to defer his service for three years to permit him to complete advanced training. Mattis agreed to go to school full-time and meet his academic requirements, and upon completion, to practice medicine in an area the secretary determined to be in need of health care professionals. Mattis certified that he was willing to serve in any area or climate and agreed to practice in the area assigned him by the secretary. The government gave Mattis roughly $40,000.

Plaintiff requested and received a three-year deferment in 1981 to pursue an emergency medicine residency in Milwaukee. Around June 20, 1983, the government sent Mattis information on the "early decision alternative" under which Mattis could attempt to arrange his own placement in a number of different areas before September 30, 1983. Failing that he would be assigned to an area by the government based upon the preferences he had expressed to the NHSC. Once so assigned he would have until April 16, 1984, to find a service site. If he did not, the government

would assign him to a health manpower shortage area where he would have the choice of setting up his own practice or taking an assigned position.

The June 20, 1983, package included vacancy lists for the Indian health service (including two listings for emergency medicine), the 1984 opportunity list which did not contain any emergency medicine positions, and a representation that further emergency medicine lists would be forthcoming. On August 1 and 30, and September 30 of that year those lists were provided. The August 30 communication also indicated that the early decision period for emergency medicine positions had been extended until October 31, 1983.

The emergency medicine opportunities were identified by the NHSC staff and its state placement contractors. The hospitals listed were located in primary care health manpower shortage areas that were 50 or more miles from a tertiary care hospital. The secretary did not guarantee that all the listings were accurate. As it turned out, many were not in fact available or later removed from the list for other reasons.

Mattis went to the House of the Good Samaritan hospital in Watertown, New York. That hospital was not on the approved list. It is adjacent to, but not within, a medically underserved area and it is 75 miles from a tertiary care facility. The president of that hospital contacted NHSC about Mattis serving his three years there and pointed out that it would be the hub of an Emergency Medical Service Program which would include various underserved areas. Mattis himself wrote the NHSC requesting the opportunity to practice in New York, and describing what his duties there would be. The government denied Mattis' request for placement in New York because the location was not within a health manpower shortage area and the practice he described was not a full-time clinical practice.

Mattis did not find a placement by the end of the early decision period and he was assigned to Region VI on November 18, 1983. In December of that year Mattis attempted a match in Arkansas for an emergency position at a hospital that had been listed as approved by the secretary. That hospital was subsequently removed from the list by the secretary and Mattis was denied permission to practice at that location. Mattis attempted unsuccessfully to find another placement in the area. On March 28, 1984, Mattis informed the government that he was taking the position at the New York hospital and that he felt that that placement met his obligations to the government.

On April 18, 1984, the government assigned him to New Mexico to fill an emergency medical position with the Indian Health Service. Pursuant to his request, the government also sent him a calculation of his outstanding debt. On May 8, 1984, the government informed Mattis that he had five days to finalize his plans with the Indian Health Service or a recommendation that he be placed in default would be made. After discussions between the parties' attorneys Mattis commenced this lawsuit and accepted the position in New York.

## Legal Analysis

The plaintiff signed a contract which gave the defendants the final decision as to where he would have to begin his medical career upon completion of his training. Plaintiff attacks that assignment and the way the decision was made. Mattis claims the secretary should have established separate criteria to determine emergency medicine manpower shortage areas, that Health and Human Services arbitrarily and capriciously failed to approve the House of the Good Samaritan as an appropriate placement for him, and that the defendants' breach has relieved him of his obligations under the contract. The government argues that the plaintiff lacks standing to challenge how the government defines a health manpower shortage area and that the defendants' actions have not been arbitrary and capricious. The government asks the court to find on summary judgment that the plaintiff has defaulted on his contractual obligations.

■ This court may set aside the secretary's decision only when they are "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) An administrator may not include in his analysis factors irrelevant to the congressional purpose of the program at issue, nor ignore factors congress has found to be significant. The court is not allowed to substitute its judgment for that of the agency.

Plaintiff first questions the failure of Health and Human Services to establish separate criteria for designating areas suffering shortages of emergency medical care personnel. Plaintiff lacks the necessary standing to challenge that discretionary decision of the secretary because the plaintiff's alleged injury is not "arguably within the zone of interests to be protected or regulated" by the statute that was allegedly violated. *United States v. SCRAP*, 412 U.S. 669, 686, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973).

The statute that governs designation of health manpower shortage areas, 42 U.S.C. § 254e, is directed to protecting the interests of people who reside in those parts of the United States that suffer from a shortage of medical manpower. Although scholarship recipients must ultimately serve in such areas, and are affected by the secretary's decisions in that regard, the statute is directed to providing for the needs of the patients, not the medical personnel. As such, plaintiff lacks standing to challenge the defendant's failure to create separate criteria for emergency medicine.

■ Even if the court were able to find that the plaintiff was within the "zone of interest," plaintiff has failed to make any showing that the secretary's discretionary decision to establish separate criteria for primary care and psychiatry, but not emergency medicine, was arbitrary and capricious.

■ Plaintiff next challenges the secretary's alleged failure to provide him with appropriate placements, and the secretary's failure to allow plaintiff to serve his required time at the House of the Good Samaritan hospital. These claims too must be judged against the arbitrary and capricious standard.

Plaintiff points out that several of the emergency medical positions listed by the secretary were not in fact available but he was nonetheless provided with three lists of placement opportunities, within his specialty, during the early decision period. When he failed to make a match he was given the opportunity to fulfill his contractual obligations, practicing emergency medicine, in a health manpower shortage area in New Mexico.

The secretary never guaranteed the listed positions were still available. The lists resulted from the secretary's good faith effort to locate emergency positions that were, as required by statute, in areas of the country wherein the secretary had determined that medical personnel were in short supply. While Mattis would have preferred placement in New York or at one of the hospitals that were incorrectly included on the earlier lists, he was contractually obligated to practice medicine where the secretary assigned him. Plaintiff has failed to make a showing that the secretary acted arbitrarily or capriciously in providing plaintiff with placement opportunities.

■ Plaintiff also attacks the secretary's failure to find that he can meet his obligations under the contract at the House of the Good Samaritan hospital in Watertown, New York. Plaintiff's attack fails because neither Watertown nor that hospital are, as required by 42 U.S.C. § 254 and plaintiff's contract, located within a health manpower shortage area. Plaintiff has failed to make any showing that the secretary, in making the discretionary decision that the House of the Good Samaritan was not an appropriate placement, acted in an arbitrary and capricious manner. The secretary was entitled to find that the plaintiff's services were needed elsewhere, and did so.

Plaintiff has failed to raise any issues of material fact in opposition to the defendants' motion for summary judgment. The motion will be granted because the secre-

tary did all that was required of him under the law and the contract but the plaintiff failed to report for service where he was properly assigned. Plaintiff's action for declaratory judgment must fail because it is he, and not the secretary, who has failed to meet his legal obligations. Pursuant to the contract the parties entered into, the secretary is entitled to recover from the plaintiff three times the amount of the scholarship he was awarded, plus interest.

IT IS THEREFORE ORDERED that the motion of the defendants for summary judgment is granted and that this action is dismissed with prejudice.