**UNITED STATES, Plaintiff,**

v.

**Gary Dean HATCHER, Defendant.**

**No. 87–0036–GT(M).**

United States District Court,
S.D. California.

June 19, 1989.

Robert H. Plaxico, Asst. U.S. Atty., for U.S.

Gary Dean Hatcher, Santee, Cal., pro se.

MEMORANDUM DECISION
AND ORDER

GORDON THOMPSON, Jr., Chief Judge.

On June 19, 1989 at 10:30 a.m., the parties' cross-motions for summary judgment came on for hearing before the Honorable Gordon Thompson, Jr. Assistant United States Attorney Robert H. Plaxico appeared on behalf of the plaintiff. Gary Dean Hatcher appeared on his own behalf. Having considered all the pleadings, exhibits, and declarations submitted in support of and in opposition to the motions, as well as the arguments at the hearing, the court finds that there are no issues of material fact and rules as follows.

FACTS

Defendant Gary Dean Hatcher received $73,657 from the National Health Service

Corps ("NHSC") Scholarship Program, established by Congress in 1976 to address the maldistribution of health manpower in the United States. *See* Pub.L. No. 94–484, 90 Stat. 2270 (1976) (codified at 42 U.S.C. §§ 254d–254r). Under the Scholarship Program, eligible students in professional health degree programs receive scholarships that cover tuition, fees, other reasonable educational expenses, and a support stipend for each year of academic training. 42 U.S.C. § 254*l* (g). In return, the student agrees in a signed written contract to serve a period of obligated service in a health manpower shortage area ("HMSA") designated by the Secretary of Health and Human Services. 42 U.S.C. § 254*l* (b)(4). The United States is entitled to recover treble the amount of scholarship funds paid to the student, plus interest, if the student defaults on his agreement by failing to serve in his assigned HMSA. *See* 42 U.S.C. § 254*o* (b)(1).

Approximately one year prior to the time scholarship recipients are to begin their obligated service, the NHSC sends them information regarding the assignment process and the available HMSA locations. Assignment of scholarship recipients takes place in three phases. Through the "Early Decision Alternative Phase," scholarship recipients have until September 30 to apply and be accepted at a location included on the HMSA Placement Opportunity List. In the "State or Region Assignment Phase," those who did not obtain a position in the first phase would be assigned to a state or region and could then seek placement at a site in that area. In the "Final Match Phase," recipients who had still not obtained a position by April 15 of the following year would be assigned to a specific site by the NHSC.

In the instant case, Dr. Hatcher has refused to perform his obligated service in the region to which the NHSC assigned him. Hatcher entered into the NHSC Scholarship Program contract on April 8, 1980. He admits having previously reviewed an NHSC Information Bulletin which stated

> The NHSC will ask participants their location preferences about 1 year prior to

assignment. The NHSC will attempt to match these preferences, especially when there is a likelihood that participants will continue to practice in the shortage areas after their service obligations are completed. However, to comply with the legislative requirements and to avoid staffing imbalances, the NHSC reserves the right to make final decisions on assignments.

Hatcher was scheduled to graduate from medical school in June, 1984. The NHSC required all graduates to obtain a one-year deferment of their service obligation so they could complete their internships. Hatcher received a letter from the NHSC encouraging students to obtain additional residency training, for which an additional deferment could be obtained. The letter warned that placement opportunities for NHSC doctors without residency training were very limited. Accordingly, Hatcher applied to the NHSC's Deferment Team for a deferment to pursue a one-year osteopathic internship and a three-year residency in psychiatry. The NHSC granted Hatcher a four-year deferment.

On June 8, 1984, Hatcher wrote Dr. Kenneth P. Moritsugu, the Director of the NHSC, with some "comments and requests for information." Hatcher's letter was in response to a May 24 mailing to Scholarship Program participants in which Dr. Moritsugu introduced himself as the new NHSC Director, and discussed the direction and policies of the program. The mailing invited participants to write with questions or comments. In his letter, Hatcher commented,

> *I can not affort* [sic] to remain in school after my internship. I owe too much money for my medical education, and a residency will only place me deeper in debt. I may return for further *taining* [sic] after I build a financial base and clear some of my debt.

(Emphasis in original). Hatcher specifically requested information regarding the locations of the various HMSA's, when the placement opportunity list would be avail-

able, and the procedures for obtaining a startup loan for a private practice.

Dr. Mortisugu's deputy responded to Hatcher's specific questions in a letter dated June 25, 1984. He did not understand Hatcher's letter to constitute a formal request to cancel Hatcher's three-year residency deferment. Accordingly, Hatcher's name did not appear on the list of scholarship recipients who would be entering the 1985 placement cycle, and Hatcher did not receive placement materials at the time they were sent to other intern-trained physicians. On August 11, Hatcher wrote Dr. Moritsugu's deputy and requested that he be sent the placement materials. Hatcher's request was transferred from the central NHSC office to those in the agency specifically responsible for placement, and Hatcher received the placement materials on September 14.

Hatcher attempted to obtain a position in the Fresno County and San Joaquin Valley areas during the Early Decision Alternative Phase, which was extended until October 31. Upon learning that all the positions in those areas were filled, he applied for a family practice position in Cedarville, the only such vacancy remaining in California. Hatcher failed to obtain the Cedarville position, and was assigned to Texas in the next placement phase. On January 1, 1985 Hatcher informed the NHSC that he would not perform his service obligation in Texas, and he made no further attempts to obtain a position. The NHSC subsequently declared Hatcher in default of his service obligation. The government now seeks judgment against Hatcher pursuant to 42 U.S.C. § 254o.

### DISCUSSION

■ Hatcher contends that he should not be held in default because the NHSC sent him its placement materials several weeks after the materials were sent to other scholarship recipients, putting him at a disadvantage in the placement process. The obligations of the NHSC to scholarship recipients are not governed by contractual principles. *Rendelman v. Bowen*, 860 F.2d 1537, 1542 (9th Cir.1988). Rather, the appropriate inquiry in this case is whether the NHSC properly followed the applicable statute and regulations when it assigned Hatcher to Texas. *See id.* The court may overturn the NHSC's declaration of default only if it was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

■ The record demonstrates that the NHSC's actions with respect to Hatcher were entirely appropriate and in accordance with the governing law. As an initial matter, it was made clear to Hatcher from the beginning that he had no guaranteed right to placement in the location of his choice. The informational brochure which Hatcher reviewed before entering the program specifically warned, "the NHSC reserves the right to make final decisions on assignments." As the Ninth Circuit recently stated, "Congress has plainly given the Secretary the authority and discretion to make a final determination on the placement of scholarship recipients." *Rendelman*, 860 F.2d at 1543. Hatcher therefore cannot claim any vested right to a particular assignment.

Hatcher's belated receipt of his application materials cannot be attributed to any arbitrary or capricious behavior on the part of the NHSC. On the contrary, responsibility for the confusion regarding the application materials properly lies with Hatcher. Hatcher had received a deferment for three years beyond his internship. Rather than writing the Deferment Team and informing them that he wished to cancel his deferment, Hatcher made an ambiguous reference to his inability to afford continuing his medical education in the June 8, 1984 letter to the NHSC Director. It is understandable that the Director's office interpreted that statement as nothing more than a general comment.

In addition, the deferment information letter sent to Hatcher on April 6, 1984 informed him that if he did not receive placement materials "by July 20, it is your responsibility to notify Mr. Joseph Hayden, Chief, Recruitment and Placement Branch, NHSC, Room 6–40, 5600 Fishers Lane, Rockville, Maryland 20857." A toll free

number which Hatcher could call was even included. When Hatcher finally did specifically write to request the placement materials, he further exacerbated the situation by sending his letter to the NHSC Director's office. The delay incurred in transmitting the request to the Placement Branch and then sending the materials to Hatcher was by no means inordinate.

Hatcher furthermore argues that the NHSC's placement policy favoring resident-trained physicians over intern-trained physicians lacks a rational basis and is therefore arbitrary and capricious. Although the relevance of this argument is questionable, since Hatcher would not have received his placement materials any earlier even if resident- and intern-trained physicians received their application materials at the same time, the record reflects a sound basis for such a preference.

The initial purpose of the NHSC Scholarship Program was to place doctors in areas which were medically underserved, or not served at all. The NHSC in the early 1970's needed to place doctors with any amount of training, however minimal, to staff such areas. By the 1980's, however, there had been a huge influx of new doctors into the medical profession and a growing trend toward specialization. As a result, there had been a diffusion of physicians into areas that otherwise would not have access to health care. The goal of the NHSC accordingly changed from merely placing doctors in underserved areas to upgrading the quality of care in areas which were formerly underserved. As noted in the deferment letter of April 6, 1984 to program recipients, communities could now afford to be more choosy about which doctors they selected from the NHSC program and hospitals were less inclined to grant privileges to those who only had intern training. Since many sites would consider intern-trained doctors only after first reviewing applications from resident-trained physicians, it was reasonable to provide residents with placement materials at an earlier time.

## CONCLUSION

Accordingly, the government's motion for summary judgment is hereby GRANTED. Hatcher's cross-motion for summary judgment is DENIED.

IT IS SO ORDERED.