**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Gary D. HATCHER, Defendant–Appellant.**

No. 89–55922.

United States Court of Appeals, Ninth Circuit.

Submitted Oct. 5, 1990 [*].

Decided Jan. 8, 1991.

* The panel finds this case appropriate for submission without oral argument pursuant to Ninth Circuit Rule 34–4 and Fed.R.App.P. 34(a).

Gary D. Hatcher, Modesto, Cal., defendant-appellant in pro. per.

Jennifer H. Zacks, U.S. Dept. of Justice, Civ. Div., Washington, D.C., for plaintiff-appellee.

Before BEEZER and TROTT, Circuit Judges, and CROCKER, District Judge **.

TROTT, Circuit Judge:

Gary D. Hatcher appeals a summary judgment in which the district court found the United States was entitled to stipulated losses resulting from Hatcher's breach of a government-awarded scholarship agreement. *United States v. Hatcher*, 716 F.Supp. 447 (S.D.Cal.1989). Hatcher makes three claims on appeal, each of which lacks merit. We affirm.

## I

### Facts and Proceedings Below

A thorough statement of the facts appears in the district court's published opinion. *Id.* at 447–49. Our discussion of the facts is therefore abridged.

In 1976 Congress enacted the National Health Service Corps ("NHSC") Scholarship Program. *See* Pub.L. No. 94–484, 90 Stat. 2270 (1976) (codified as amended at 42 U.S.C. §§ 254d–254q (1988)). The program was designed to "address the maldistribution of health care manpower in the United States." *Rendleman v. Bowen*, 860 F.2d 1537, 1539 (9th Cir.1988).[1] Under the program, the NHSC grants eligible medical students scholarships covering their educational costs and living expenses. 42 U.S.C. § 254*l* (g) (1988). In return, the students sign a written contract promising to serve in a Health Manpower Shortage Area

("HMSA") for a term equal in duration to the number of years they received scholarship support (but not to exceed four years). 42 U.S.C. §§ 254e, 254*l* (b)(4), 254*l* (f)(1)(B)(iv), 254m (1988); 42 C.F.R. § 62.8 (1989). The NHSC requires scholars to complete a one-year internship after graduating from medical school and before beginning their service. 42 C.F.R. § 62.9(b) (1989). However, scholars are encouraged to apply for deferments of their service obligation (of up to three additional years) in order to participate in a residency program. 42 C.F.R. § 62.9(a) (1989).

Congress has given the Secretary discretion to designate certain regions of the country as HMSAs, taking into account various factors indicating the need for medical services. 42 U.S.C. § 254e (1988). It has also given the Secretary essentially uncircumscribed authority in assigning scholars to HMSAs. *See* 42 U.S.C. § 254m(d) (1988); *Rendleman*, 860 F.2d at 1543; *Duffy*, 879 F.2d at 195–97; *Keepers v. Bowen*, 687 F.Supp. 1497, 1498 (D.Or. 1986).

> Although every attempt is made to assign scholarship recipients to an HMSA in the location of their choice, some regions are substantially more popular than others. The very purpose of this Congressional program is to have new health care professionals deliver medical services to areas suffering shortages of medical personnel. Thus, the Secretary must locate some recipients in less desirable areas.

*Rendleman*, 860 F.2d at 1543. The NHSC has not promulgated a regulation describing the process by which scholars are assigned to particular HMSAs, however it has developed a formal three-phase placement procedure. In the first phase, scholars apply to specific sites within HMSAs and a lucky few are granted their first choices. The rest continue to the next

---

** Honorable M.D. Crocker, Senior United States District Judge, sitting by designation.

1. "The program is not intended 'as a mechanism solely to subsidize health professional education,' but 'as a means to overcome a geographic maldistribution of health professionals.'"

*Rendleman*, 860 F.2d at 1541 (quoting S.Rep. No. 94–887, 94th Cong., 1st Sess. 201 (1975), U.S.Code Cong. & Admin.News 1976, 4947; *see also, United States v. Duffy*, 879 F.2d 192, 195 (6th Cir.1989).

phase, where they specify a state or region of the country in which they would like to work. Those who remain after this stage are given the opportunity to find an HMSA site on their own, but if they fail to do so they are assigned to an HMSA by the NHSC.

Many scholars are unhappy with their service assignments and therefore choose to default on their obligations. Consequences of a default are severe. Congress has provided that a scholar who defaults shall pay stipulated damages according to a formula which triples the dollar value of the scholar's education. 42 U.S.C. § 254o (1988); 42 C.F.R. § 62.14(b)(3) (1989). The amount owed in this case, for example, exceeds $500,000 including interest.

On April 8, 1980, Gary Hatcher signed a scholarship contract and enclosed it with his application. The agreement tracked the language of the statute and pertinent regulations, warning Hatcher of the consequences of default. His application was approved, and the NHSC paid his educational and other expenses until spring 1984, when he graduated from medical school with a degree in osteopathic medicine. Upon graduating Hatcher entered a one year internship program, and in addition obtained from the NHSC a three year deferment of his service obligation in order to undertake a residency.

During his internship Hatcher began to experience financial difficulties, so he decided to cancel his three year deferment and begin his service obligation as soon as his internship ended. He wrote the NHSC an ambiguous letter on June 8, 1984, which he now claims was a request that NHSC cancel his deferment and place him in the pool of applicants to be assigned to HMSAs in the coming fall. The NHSC did not understand Hatcher's letter to request these responses, and therefore did not put him in the pool. After another series of mix-ups and misunderstandings (caused by Hatcher), he was finally enrolled in the placement process. By that time, however, many of the more "choice" HMSA sites were taken. Hatcher tried to find a suitable site on his own, but failed. The NHSC then assigned him to an HMSA in Texas, where he declined to serve. The NHSC repeatedly offered Hatcher amnesty if he would agree to fulfil his obligation, but he refused each time, and eventually was placed in default and asked to pay stipulated damages.

In the district court, the parties framed the issues in terms of contract law.[2] Hatcher raised various contract defenses to the government's claim of breach, of which two originally survived the government's motion for summary judgment. The district court initially determined disputed material facts existed as to whether NHSC had breached *its* duties under the contract, and whether NHSC was estopped from bringing the default claim on grounds it had misled Hatcher. Meanwhile, in *Rendleman* we held the parties' obligations in this context are defined by statutory and not contract principles. 860 F.2d at 1541–42. Based on *Rendleman*, the district court examined Hatcher's claims under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1988), and awarded summary judgment to the government. *Hatcher*, 716 F.Supp. at 449–50. Hatcher timely appeals.

## II

We review de novo a grant of summary judgment. *Kruso v. Int'l Telephone & Telegraph Corp.*, 872 F.2d 1416, 1421 (9th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). We may affirm only if we find no genuine issue of material fact exists, and that the moving party is entitled to judgment as a matter of law. *Figueroa v. Sunn*, 884 F.2d 1290, 1292 (9th Cir.1989). We will uphold an agency decision unless it is "arbitrary, capricious, an abuse of discretion, or other-

---

**2.** The district court had jurisdiction under 28 U.S.C. § 1345 (1988) ("[T]he district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof ex-

pressly authorized to sue by Act of Congress."). Under the Act, a scholar found in breach of a service obligation is liable to the United States. 42 U.S.C. § 254o (1988).

wise not in accordance with law...." 5 U.S.C. § 706(2)(A) (1988); *Simpson v. Hegstrom*, 873 F.2d 1294, 1297 (9th Cir.1989).

## III

### *Whether Common Law Contract Principles Apply*

■ As an initial matter, we must decide whether contract principles are relevant to this case in any respect. Each applicant for a scholarship must

> sign and submit to the Secretary, at the time of submittal of [the] application, a written contract (described in subsection (f) of this section) to accept payment of a scholarship and to serve (in accordance with this subpart) for the applicable period of obligated service in a health manpower shortage area.

42 U.S.C. § 254*l* (b)(4) (1988). Though the statute uses the word "contract," *Rendleman* offers a convincing basis for rejecting the argument that contract law applies here.

Appellant in *Rendleman*, a medical student who signed a scholarship agreement with the NHSC, sued in federal court for an order declaring him not in default. Like Hatcher, he applied for and received a three year deferment of his service obligation in order to participate in a residency program. He later dropped out of the program without prior approval from the NHSC and began to work at a hospital near Portland, in the belief that he was satisfying the terms of his service obligation. The NHSC notified him that the hospital was not within a designated HMSA, but gave him a chance to find an appropriate work site. When Rendleman failed to do so, the NHSC assigned him to an HMSA in Alabama, where he refused to go. Eventually he was placed in default and asked to pay stipulated treble damages.

At the outset, we disposed with the idea that contract law governed Rendleman's dispute:

> In passing the statute, Congress intended to implement certain public policy goals by conditioning receipt of scholarship aid upon compliance by the recipient with federal statutory and administrative directives. These conditions do not arise from a negotiated agreement between the parties; rather, they are provided for in the statute. Statutory intent, therefore, is more relevant to the interpretation of these conditions than are common law contract principles.[3]

> In addition, the plain language of the statute demonstrates that Congress did not intend that contract principles govern the interpretation of the relationship between the Secretary and a scholarship recipient. [citation omitted] The only terms contained in the written agreement signed by a recipient are those required by the statute—that the recipient agrees to accept the aid, that upon completion of the educational program the recipient

---

**3.** At this juncture the court cited *American Hosp. Ass'n v. Schweiker*, 721 F.2d 170, 182–83 (7th Cir.1983), *cert. denied*, 466 U.S. 958, 104 S.Ct. 2169, 80 L.Ed.2d 553 (1984), a case in which the Seventh Circuit reviewed a "contract" dispute between a hospital association and the government, and where the agreement at issue was largely controlled by a statutory scheme. The association claimed an "impairment" of its "contract rights," to which the *Schweiker* court responded:

> With respect to this argument, we note, first of all, that the relationship between the government and the hospitals here cannot be wholly captured by the term "contract" and the analysis traditionally associated with that term. Rather than a voluntary agreement negotiated between two parties, a grant-in-aid program like that under the Hill–Burton Act is an exercise by the federal government of its authority under the spending power to bring about certain public policy goals. The government acts by inducing a state or private party to cooperate with the federal policy by conditioning receipt of federal aid upon compliance by the recipient with federal statutory and administrative directives. *See Fullilove v. Klutznick*, 448 U.S. 448, 474, 100 S.Ct. 2758, 2772, 65 L.Ed.2d 902 (1980). The "conditions" of this arrangement are not the result of a negotiated agreement between the parties but rather are provided by the statute under which the program is administered. Determination of statutory intent, therefore, is of more relevance to the interpretation of these conditions than is an inquiry into the intent of the two parties at the moment of the initial agreement. The contract analogy thus has only limited application.

*Schweiker*, 721 F.2d at 182–83.

will serve in an HMSA, and that the recipient will pay triple damages if found in default on the obligation. 42 U.S.C. § 254*l* (f). Other conditions that affect scholarship recipients' service, such as the designation of HMSAs, are not included in the contract, although Congress addressed those issues in the statute. Thus, the obligations of the Secretary are to be based on statutory and not contractual principles.[4]

*Rendleman* at 1541–42 (citations omitted). The court then went on to find the Secretary had "properly followed the statute and regulations." *Id.* at 1543.

Hatcher offers no means of distinguishing *Rendleman,* and we can think of none ourselves. We thus view this case through the prism of the APA, not contract law.

## IV

*Whether NHSC Acted Arbitrarily or Capriciously in Processing Hatcher's Application and Request for Materials*

■ Hatcher appears to argue the NHSC's actions toward him were arbitrary and capricious, and an abuse of discretion. 5 U.S.C. § 706(2)(A) (1988). In *Rendleman* we held that "Congress has plainly given the Secretary the authority and discretion to make a final determination on the placement of scholarship recipients." *Rendleman,* 860 F.2d at 1543 (citation omitted). In the present case, the district court concluded the NHSC had followed all pertinent laws and regulations, had not abused its discretion, and had not acted arbitrarily or capriciously. *Hatcher,* 716 F.Supp. at 449–50. We agree.

Hatcher contends the NHSC acted wrongfully when, after receiving his June 8, 1984 letter, it failed to place him in the pool of applicants to be assigned an HMSA in 1985. That letter, he claims, contained a sufficiently clear expression of his desire to be placed in the pool. As a result of the error, he was relegated to the end of the applicant list and assigned an HMSA in Texas instead of one in California, his preferred state. Given these circumstances, he argues, he was entitled to refuse the assignment and therefore the agency's decision to place him in default was arbitrary and capricious.

When Hatcher sent the Director of the NHSC his letter dated June 8, 1984, he had just begun a one year internship to be followed by a three year residency program. He had obtained a deferment of his service obligation until completion of this four years of continued training. According to agency files, then, Hatcher was not expected to apply for an HMSA in the near future. Hatcher *did* have the option (which he claims to have exercised in the June 8th letter) of canceling his deferment, and requesting a position in the fall 1984 pool of HMSA applicants. But he could cancel his deferment only by first requesting and obtaining the NHSC's approval.[5]

As the district court found, the June 8th letter did not clearly express Hatcher's wish to cancel his deferment and enter the pool, especially in light of the agency's assumption that he would be preoccupied for the next four years. Hatcher began the letter by saying he was writing in response to a policy statement issued by the Director some weeks before, with

---

**4.** Several district courts have considered this subject and arrived at the same result. *United States v. Martin,* 710 F.Supp. 271, 274–75 (C.D. Cal.1989) (rejecting as irrelevant medical student's contract defenses of "impossibility" and "unconscionability"); *United States v. Turner,* 660 F.Supp. 1323, 1330–31 (E.D.N.Y.1987) (rejecting "economic duress" defense); *United States v. Redovan,* 656 F.Supp. 121, 126–27 (E.D. Pa.1986), *aff'd,* 826 F.2d 1057 (3d Cir.1987) (applying APA "arbitrary or capricious" test, but also considering and rejecting estoppel defense on facts); *Mattis v. United States,* 648 F.Supp. 137, 140 (E.D.Wis.1986) (applying APA).

**5.** "(c) *Altering deferment.* Before altering the length or type of approved graduate training for which the period of obligated service was deferred under paragraphs (a) or (b) of this section, the participant must request and obtain the Secretary's approval of the alteration." 42 C.F.R. § 62.9(c) (1989).

Hatcher's June 8th letter did not clearly request a change in the length of his deferment. Because he needed to make such a request and obtain NHSC permission before entering the HMSA applicant pool, it is understandable NHSC did not simply place him there upon receiving his letter.

"some comments and some requests for information." He then explained:

> I *can not affort* [sic] to remain in school after my [one year] internship. I owe too much money for my medical education, and a residency will only place me deeper and deeper in debt. I may return for further taining [sic] after I build a financial base and clear some of my debt.

In the next six paragraphs, Hatcher complained the financial support from his scholarship was insufficient and made vague threats of asserting his "legal position." Finally, he made a request for information. He asked for: (1) a list of HMSA sites in California; (2) the date on which the latest "placement opportunity list" ("POL") would be available; and (3) a description of the NHSC's policy on private practice "start up loans."

The district court decided the letter had not communicated Hatcher's intention to cancel his deferment and that it could not be viewed as a request to be placed in the 1984 HMSA applicant pool. Instead, the court characterized it as "an ambiguous reference to [Hatcher's] inability to afford continuing his medical education" and "nothing more than a general comment." *Hatcher,* 716 F.Supp. at 449. The fact that Hatcher asked for information about current HMSA sites did not signal that he had formally decided to give up his four year training program and enter the applicant pool.

The Director's letter in response, dated June 25, 1984, confirms he honestly had no inkling that Hatcher's letter was what Hatcher now claims it to be. After responding to Hatcher's criticisms of agency funding policies, and sympathizing with his financial plight, the Director stated: "Your choice whether to complete your residency training before or after completion of your scholarship obligation is a personal one, which all obligated physicians must make." This strongly implies the Director believed Hatcher was still in the process of making a decision whether to cancel his deferment and begin working at an HMSA site. As to Hatcher's request for the list of current HMSA sites, the Director, obviously believing Hatcher was not going to apply until his four year training program was completed, replied that it was not possible to send him a listing of the available sites for his placement year because such lists were available "just one year in advance." If Hatcher only wanted the POL for 1985, he said, this would be ready by mid-July of that year. At most, the Director's belief was an honest misinterpretation; more likely, he had no reason to think other than he did.

Meanwhile, the selection process had begun and Hatcher had not yet been placed in the pool. He wrote to the Director again on August 11, 1985, requesting placement materials that had already been delivered to his more diligent peers. But the Director's office, Hatcher later discovered, was not responsible for processing requests for these forms. Hatcher had bungled again: NHSC pamphlets in his possession clearly stated the correct address; he had just neglected to consult them.[6] The Director's office forwarded Hatcher's request to the appropriate division, but this took time, and Hatcher did not receive the materials until September 14, 1984.

Hatcher admits his mistake but claims the four week delay in sending him the forms was unreasonable. He also states the package of forms eventually sent to him was missing the crucial "Site Selection Questionnaire," without which he could not indicate his preferences. Lacking this document, he decided to create his own preference list on plain paper, which was rejected by the NHSC on September 20, 1984 for failure to comply with the rules. Hatcher submitted the official form on September 24, but by then the last available California HMSA site had been filled. When Hatcher

---

6. One form letter also advised students intending to enter the 1984–85 placement process that if they had not received application forms by July 20, it was their responsibility to notify the placement office. The same letter warned that few openings would be available to students, who, like Hatcher, had decided to complete only the one year internship instead of the three additional years of residency.

could not locate an alternative HMSA site, he was assigned to one in Texas.

On these facts, there is no basis for holding the NHSC acted arbitrarily or capriciously in its dealings with Hatcher. The record indicates Hatcher, not the NHSC, was responsible for his misfortune. The NHSC acted within its powers and in a rational fashion when it declared Hatcher in default. Hatcher's defense based on alleged administrative delays by the NHSC is meritless. There are no disputed facts here preventing summary judgment.

## V

### Alleged Discriminatory Treatment by the NHSC

■ Hatcher contends the NHSC discriminated irrationally between intern-trained and residency-trained scholars, giving preference to the latter. Specifically, he contends the NHSC acted arbitrarily and capriciously in mailing HMSA application materials in staggered increments, first to trained residents and then to one-year interns like himself.[7]

There is a rational basis for the NHSC's decision to prefer residency-trained over intern-trained scholars, as the district court held. *Hatcher,* 716 F.Supp. at 450. When the NHSC Scholarship Program was first launched in the mid 1970s, there was a crying need for doctors of all abilities. Hospitals located within HMSAs could not afford to be choosey. There is now a greater supply of doctors participating in the program, so hospitals may demand students with more advanced training. Consistent with this change in need, the NHSC has staggered the placement process so that hospitals have an opportunity to pick from the cream of the crop instead of having to receive and review a flood of applications all at once. The NHSC's policy is a sensible one.

Hatcher was clearly told he would be in a less advantageous position if he began his service before completing a three year residency program. In addition to challenging NHSC's policy of distinguishing between groups, however, he also claims NHSC's mail-staggering practice was an illegitimate extension of that policy. This argument fails because the NHSC's mail-staggering policy is rationally related to its primary goal of preferring residency-trained scholars. We reject Hatcher's claim that NHSC acted arbitrarily or capriciously in preferring one group over the other and in adopting a mailing policy to reflect that preference.

## VI

### The Estoppel Claim

#### A. The Present Status of the Law of Estoppel

■ Reduced to essentials, Hatcher's estoppel theory is that the NHSC engaged in affirmative misconduct by not informing the scholarship community of its mail-staggering policy. The NHSC's general warning that residents would receive preference in the placement process did not give interns like Hatcher a sufficient description of exactly how they would be disadvantaged. Had Hatcher known of this policy he might have decided not to become an NHSC scholar, or he might have decided to complete the three year residency program before fulfilling his service obligation. *See generally, United States v. Gross,* 725 F.Supp. 892, 895 (W.D.La.1989) (considering and rejecting NHSC scholar's equitable estoppel defense).

In the three major estoppel cases of this decade, the Supreme Court held estoppel is still a valid claim against the government, but intimated there must at least be a showing of "affirmative misconduct." *Schweiker v. Hansen,* 450 U.S. 785, 788, 101 S.Ct. 1468, 1471, 67 L.Ed.2d 685 (1981) (per curiam); *Heckler v. Community Health Servs.,* 467 U.S. 51, 60–61, 104 S.Ct. 2218, 2224–25, 81 L.Ed.2d 42 (1984); *Office of Personnel Management v. Richmond,* — U.S. ——, 110 S.Ct. 2465, 2470–71, 2472, 110 L.Ed.2d 387 (1990). In the Ninth

---

**7.** The NHSC, in a letter to Hatcher dated September 10, 1984, admitted such a policy existed, though the policy had not been made public: "Mailings to NHSC Scholars completing their residencies in 1985 were sent prior to those completing internships."

Circuit, *Watkins v. United States Army*, 875 F.2d 699 (9th Cir.1989) (en banc), *cert. denied*, —— U.S. ——, 111 S.Ct. 384, 112 L.Ed.2d 395 (1990), remains the authoritative case on the subject.

The Court in *Richmond* rejected the Solicitor General's proposal to adopt a per se ban on the use of estoppel against the government. *Richmond*, 110 S.Ct. at 2471. *Richmond* does restrict the doctrine somewhat, but it does not affect the validity of *Watkins* or the outcome of this case.

In *Richmond*, the Court decided litigants may not use the doctrine of estoppel *offensively*, to support "a claim for payment of money from the Public Treasury contrary to a statutory appropriation." *Id.* at 2471; *see also, United States v. Fowler*, 913 F.2d 1382, 1385–86 (9th Cir.1990) (following *Richmond*). The plaintiff in *Richmond* sued the government, arguing that a misrepresentation by Navy personnel should estop OPM from determining he was not entitled to certain disability benefits. He had yet to receive these benefits, and would not have been entitled to them under normal circumstances. Nonetheless, he attempted to secure them by employing the doctrine of estoppel to mount an affirmative cause of action. Thus the case came under the Court's new rule, based on the Appropriations Clause of the United States Constitution,[8] that litigants may not use estoppel "as a basis for money claims against the Government." *Id.* 110 S.Ct. at 2472.

In *Watkins*, the plaintiff relied on equitable estoppel to prevent the Army from discharging him. In the case before us, Hatcher employs equitable estoppel as a defense to the government's breach of contract claim. Like Watkins, he does not use estoppel as the basis for a suit against the government for payment of money. Hatcher's assertion of equitable estoppel, if accepted, would have a negative impact on the public fisc, since the government would lose his services without securing stipulated damages. But this fact alone does not suffice to implicate the rule announced in *Richmond*.[9]

### B. *Applying the Watkins Decision to this Case*

■ Based on the Supreme Court's general teaching that "the Government may not be estopped on the same terms as any other litigant," *Heckler*, 467 U.S. at 60, 104 S.Ct. at 2224, the Ninth Circuit has developed a two-prong test which it applies as a threshold matter before deciding whether the "traditional elements" of estoppel are present. *Watkins*, 875 F.2d at 707.

One who invokes the doctrine of estoppel against the government must first establish " 'affirmative misconduct going beyond mere negligence.' " *Id.* (quoting *Morgan v. Heckler*, 779 F.2d 544, 545 (9th Cir. 1985).[10] Hatcher's only colorable estoppel argument is based on the NHSC's failure

---

**8.** U.S. Const. art. I, § 9, cl. 7.

**9.** Although *Fowler* is closer to our case, we believe it is distinguishable. In *Fowler*, the government had erroneously paid appellants funds from a government insurance program. When the government brought an action to recover the payment, appellants counterclaimed, arguing equitable estoppel prevented recovery. The court rejected appellants' theory, reasoning under *Richmond* that if estoppel were found appellants would be permitted to "retain public funds that Congress had not appropriated." *Fowler*, 913 F.2d at 1386. The instant case, by contrast, does not involve the unauthorized disbursement of federal funds. Hatcher's claim is that he need not fulfill an obligation owed the government because the government failed to fulfil its obligations to him by engaging in affirmative misconduct. As stated above, the public fisc would be affected indirectly were Hatch-

er to prevail on his equitable estoppel claim. The government has made a substantial investment in Hatcher which so far has not yielded dividends. But *Richmond* does not hold equitable estoppel is unavailable in all cases where it is shown the government would be harmed financially if the doctrine were applied. *Richmond* was concerned with direct demands on the public fisc, a situation not presented here.

**10.** Hatcher cites *Johnson v. Williford*, 682 F.2d 868, 873 (9th Cir.1982), for the proposition that a "gross negligence" standard is applicable here. In the first place, the quotation relied on comes from a portion of that case discussing *due process*, not estoppel. Moreover, even if the court meant its discussion of due process to inform its holding on the estoppel issue, the decisions of cases decided after *Johnson* control this appeal: "The Ninth Circuit treats affirmative misconduct as an *essential requirement*." *Rider v. Unit-*

to disclose its policy of staggering the mailing of its placement forms. Hatcher claims certain brochures and letters from the NHSC implied residency-trained scholars and intern-trained scholars would be treated equally for purposes of mailing, even though they were treated differently when it came to placement. Thus, he argues, the NHSC misrepresented its position. *See Seva Resorts, Inc. v. Hodel,* 876 F.2d 1394, 1400 (9th Cir.1989).

Hatcher bases his theory on two letters the NHSC sent him. On April 6, 1984, the NHSC wrote a form letter addressed to all "Scholarship Recipients Graduating in 1984," stating: "The NHSC will send you a packet of placement material and a site selection questionnaire early in July ..." On June 25, 1984, the NHSC responded to Hatcher's June 8th letter, explaining that placement lists for "the 1985 placement year will be available by mid-July." The implication of these letters, Hatcher contends, is that all contestants would be "equal at the starting gates" for purposes of receiving materials and sending in their applications.

Although the estoppel doctrine was stretched to cover the facts in *Watkins,* it would burst if extended to the present case. In *Watkins,* the Army continually reassured Watkins his career was safe. The case involved "ongoing active misrepresentations," not just "misinformation." *Watkins,* 875 F.2d at 708. Here, the NHSC told applicants they would receive placement materials sometime in July; its undisclosed decision to stagger the materials a few weeks apart does not amount to an "ongoing active misrepresentation" of

the kind spoken of in *Watkins.* The NHSC's general warning to the effect that "all scholars are not created equal" indicates such preferential treatment could be expected.[11] We hold Hatcher fails to satisfy the first prong of the threshold test under *Watkins,* and therefore we reject his equitable estoppel claim.[12]

## VII

The NHSC did not act arbitrarily or capriciously, or abuse its discretion, in processing Hatcher's requests. Its adoption of a staggered mailing policy favoring residency-trained scholars was rationally based. Finally, the NHSC's failure to disclose this policy to scholars does not estop the government from exercising its right to recover damages under the scholarship agreement.

AFFIRMED.

---

ed *States Postal Serv.,* 862 F.2d 239, 241 (9th Cir.1988), *cert. denied,* 490 U.S. 1090, 109 S.Ct. 2430, 104 L.Ed.2d 987 (1989) (emphasis supplied) (citation omitted); *see also Wagner v. Director, Fed. Emergency Mgmt. Agency,* 847 F.2d 515, 519 (9th Cir.1988).

**11.** The NHSC's April 6th letter contained the following warning:

Medical and osteopathic graduates who are planning to begin service after 1 year of graduate clinical training [the option Hatcher eventually pursued] should be aware of the very limited number of placement opportunities available for physicians with only 1 year of training. Potential sites are increasingly

unwilling to accept 1 year trained physicians because of the number of board eligible physicians competing for placements. You are strongly urged to continue in an approved residency after your first year of training, and to request deferment for the total number of years needed to complete the program even though you may not complete arrangements to continue training until next spring.

**12.** Thus we need not examine the second prong, which states that a claimant must show " 'the government's wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage ...' " *Watkins,* 875 F.2d at 707 (quoting *Morgan,* 779 F.2d at 545).