**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Alan J. CITRIN, Defendant–Appellant.**

**No. 91–15594.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 12, 1992.

Decided Aug. 7, 1992.

T. Dawn Farrison, Myers, Barnes & Jenkins, Phoenix, Ariz., for the defendant-appellant.

Michael A. Johns, Asst. U.S. Atty., Phoenix, Ariz., for plaintiff-appellee.

Before CHOY, HUG, and RYMER, Circuit Judges.

HUG, Circuit Judge:

Alan Citrin appeals from a summary judgment in which the district court found the United States entitled to statutorily prescribed damages resulting from Citrin's breach of a scholarship agreement with the United States. Citrin contends that he was excused from performing under the contract and that the damages were improperly calculated. We affirm.

The district court had jurisdiction under 28 U.S.C. § 1345. We have appellate jurisdiction under 28 U.S.C. § 1291. We review a grant of summary judgment *de novo*. *State Farm Fire & Cas. Co. v. Martin*, 872 F.2d 319, 320 (9th Cir.1989).

We must decide whether Citrin is excused from serving as a doctor in an under-served area of the country because the Government repudiated the scholarship contract, the Government took away Citrin's vested right to a deferment, or the Government violated the Administrative Procedure Act, 5 U.S.C. § 553. We also must determine whether the damages violate 42 U.S.C. § 2541 (1988), due process, or the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* (1988).

I.

In 1976 Congress established the National Health Service Corps ("NHSC") Scholarship Program ("the Program") in order to address the maldistribution of health care professionals in the United States. *See* Pub.L. No. 94–484, 90 Stat. 2270 (1976) (codified as amended at 42 U.S.C. §§ 254d–254e). The Department of Health and Human Services ("the Agency") has the authority to promulgate rules and regulations necessary to implement the Program. Under the Program, a student in a professional health degree program may receive a scholarship in exchange for the student's agreement to serve in a health manpower shortage area ("HMSA"). 42 U.S.C. §§ 254*l*(b)(4), 254*l*(e). The student must serve one year for each year that the student receives a scholarship, or two years, whichever is greater. 42 U.S.C. § 254*l*(f)(1)(B)(iv). All applicants must submit signed written contracts agreeing to serve their periods of obligated service in an HMSA. 42 U.S.C. § 254*l*(b)(4). The statute specifies the terms to be included in the contract. 42 U.S.C. § 254*l*(f).

II.

Citrin became a NHSC participant in 1979, at the beginning of his second year in medical school. On August 31, 1979, the Secretary accepted Citrin's contract and awarded the scholarship. On March 18, 1980, Citrin renewed his contract for the 1980–81 school year. He received a total of $22,134.00 in scholarship funds.

Scholarship recipients who are doctors do not begin fulfilling their service obligation immediately after graduating from medical

school. Doctors must complete at least one year of post-graduate training before beginning the period of obligated service. 42 C.F.R. § 62.9(b) (1991). It is possible for the doctor to obtain a deferral for more than one year. Under the statute, at the scholarship recipient's request, the Secretary must grant the scholarship recipient a three-year deferment "to complete an internship, residency, or other advanced clinical training." 42 U.S.C. § 254m(b)(5)(A) (1988).

According to Citrin's contract, "[d]eferment is granted for a maximum of three years, and only for completion of internship, residency, or other advanced training." Citrin argues that both the contractual and statutory language entitled him to a three-year deferment for an anesthesiology residency. The American Board of Anesthesiology requires a three-year residency in order to be eligible to take the written examination. Thus, Citrin claims, since he could complete his residency within the three years permitted by the statute and contract, he was entitled to a three-year deferment.

A March 27, 1981 letter from the Program to scholarship recipients informed Citrin that scholarship recipients were entitled to deferments only for

those programs of graduate clinical training which lead to eligibility for board certification and have been approved by the appropriate certifying boards, as determined by the Secretary of Health and Human Services....

Training which leads to eligibility for board certification is considered by the NHSC as that graduate clinical training *and years of practice* required by the appropriate American specialty board for the candidate to be eligible for, or have taken, all examinations and/or have submitted all necessary documents and other evidence needed by the board to declare that the candidate is board certified.

(Emphasis added.)

A three-year anesthesiology residency is not sufficient for board certification. After passing the written examination, the doctor must also pass an oral examination to become board certified. In order to take the oral exam, one must either complete a one-year fellowship or practice for two years. Thus, since the three-year anesthesiology residency would not be sufficient for board certification, according to the March 27, 1981 letter, Citrin would not be entitled to a three-year deferment.

Citrin argues that the March 27, 1981 letter changed the deferment policy. The Government, however, contends that there was no policy change because Citrin was never entitled to a deferment for an anesthesiology residency; the Government claims that the statute and regulations that existed at the time Citrin signed his contracts required a three-year deferment only if all post-graduate training necessary for board certification could be completed within three years.

After receiving the March 27, 1991 letter, Citrin called the NHSC and was told by someone there that he could not receive a deferment for an anesthesiology residency. Citrin took no action to challenge the policy.

Citrin eventually completed a one-year general internship, a two-year anesthesiology residency, and a one-year fellowship. He never applied for a deferment for the anesthesiology residency.

Scholarship recipients are required to submit annually a Deferment Request Form ("DRF"). Citrin failed to meet the April 30, 1982 deadline for submitting his DRF for his first-year deferment. After an additional three months had gone by, the Program sent him a letter, dated August 3, 1982, instructing him to return the DRF by August 20, 1983.

On November 29, 1982, a NHSC staff member called Citrin, asking him to return the DRF or, alternatively, a letter from his training program director, which would similarly document his chosen specialty and the beginning and ending dates of his internship or residency. Citrin was informed that if he did not return documentation of his training status by December 10, 1982, he would be placed in default of his scholarship agreement. The Program followed up by sending Citrin a letter, dated Decem-

ber 3, 1982, instructing him to return his training documentation by December 15, 1982.

On December 16, 1982, the Program received a letter from Citrin in which he stated that he was participating in a one-year osteopathic internship at Metropolitan Hospital. However, Citrin still failed to provide independent documentation of his activities. The Program made a fourth request for this information. Although Citrin agreed that he would supply a copy of his internship contract, he did not do so.

After waiting more than two additional months for documentation of Citrin's training status, the Program notified him, by letter dated February 23, 1983, that he had breached the terms of his scholarship award. Citrin then submitted a copy of his training contract. Upon the Program's receipt of Citrin's training documentation on March 9, 1983, it notified him, by letter dated March 14, 1983, that his default was rescinded and his deferment reinstated.

Citrin had the opportunity to request that his service obligation be deferred for 1983–84 if he wished to pursue training beyond his one-year internship. The Program notified Citrin that his 1983–84 DRF was due by May 27, 1983. Citrin did not seek a deferment by the stated deadline. Therefore, the Program wrote to him on June 30, 1983, stating that he would be placed in default unless he returned his DRF immediately. Citrin ignored the Program's June 30 letter and did not document his training activities or whereabouts for the 1983–84 years. Based on Citrin's violation of deferment procedures, the Program notified him, by letter dated September 30, 1983, that he was again in default of his scholarship agreement. This letter, however, also advised Citrin that he could request reinstatement of his deferment if he signed a Conditional Service Agreement ("CSA"). The CSA provided that he would be placed at a site selected by the NHSC upon completion of his training.

Citrin did not respond to the Program's September 30, 1983 letter. On January 26, 1984, the Program formally notified him that he had breached the terms and condi-tions of his deferment, as of September 30, 1983. He was further informed that his debt would become due on January 26, 1985.

During the statutory one-year repayment period following Citrin's default, the Agency sent him letters demanding payment of his debt. These letters also offered him the opportunity to repay his debt through service if he would sign a Forbearance Agreement. Under the Forbearance Agreement, the Government would forbear collection of the debt if Citrin served for two years at a site selected by the NHSC. The Skyline Credit Corporation, a collection agency used by the Agency, also offered Citrin a Forbearance Agreement. Citrin did not sign any of the Forbearance Agreements, make any payments in satisfaction of his debt, or respond to these letters in any other way.

In November 1986, after Citrin's case had been referred for litigation, his attorney notified the U.S. Attorney's Office that Citrin had completed his anesthesiology training and was willing to serve "a modest portion of his time" at the Phoenix Indian Medical Center, an Indian Health Service facility. In response, the Program agreed to let Citrin serve as an anesthesiologist at the Phoenix Indian Health Service site, but reminded him that the statute, 42 U.S.C. § 254m(a), requires scholarship recipients to serve *full-time*. The Program also informed Citrin that there were two other full-time anesthesiologist positions then available in the Indian Health Service which were approved for NHSC service. Citrin never pursued any of the Indian Health Service anesthesiology vacancies, however.

The Government sued for payment of statutory damages in the amount of treble the scholarship award and treble the legal interest rate. The district court ultimately granted the requested damages, and issued a judgment for $176,026.02 plus post-judgment interest of 6.62% per annum.

### III.

A. Citrin appeals the judgment. He contends that he was excused from his

service obligation because the Agency changed its deferment policy. He also contends that he is not liable for the full amount of damages because the damages provision in his contract was ambiguous and because the damages are so excessive that they violate his due process rights.

■ We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Tzung v. State Farm Fire & Cas. Co.,* 873 F.2d 1338, 1339–40 (9th Cir.1989). We will uphold an agency's decision unless it is arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. 5 U.S.C. § 706(2)(A) (1988); *United States v. Hatcher,* 922 F.2d 1402, 1405–06 (9th Cir.1991).

■ B. Citrin argues that, according to general principles of contract law, when the Agency told Citrin that it would not approve an anesthesiology residency, it repudiated the contract, thereby relieving Citrin of his contractual obligation to serve as a doctor in an underserved area. Citrin argues that he is obligated to return only the scholarship funds. This court, however, has already determined that statutory principles, not contract principles, govern the relationship between the Secretary and the scholarship recipient. *Hatcher,* 922 F.2d at 1406–07; *Rendleman v. Bowen,* 860 F.2d 1537, 1541–42 (9th Cir.1988). Thus, contract defenses, such as repudiation, cannot provide a defense for Citrin.

■ Citrin claims that the Agency violated his statutory and Fifth Amendment rights by taking away his vested right to a three-year deferment to complete an anesthesiology residency. He relies on *United States v. Larionoff,* 431 U.S. 864, 877–82, 97 S.Ct. 2150, 2158–60, 53 L.Ed.2d 48 (1977), in which the Supreme Court held that the Government could not take away reenlistment bonuses from enlisted members of the Navy after the members had already agreed to reenlist but before their original enlistments ended and the new enlistment periods began.

*Larionoff* is not on point because there the Government took away the vested right. In Citrin's case the Government did not take away the allegedly vested right to a three-year deferment to complete an anesthesiology residency. After Citrin had already completed his training, the Government offered to let him serve his two years. This opportunity was a de facto deferment and is exactly what Citrin claims was taken away from him.

Moreover, even if Citrin did have a right to a deferment, that right was not absolute; it was contingent upon his application for a deferment. The statute on which Citrin relies for his claim that he was entitled to the deferment provides:

*[A]t the request of such an individual* with whom the Secretary has entered into a contract under section 2541 of this title prior to October 1, 1985, the Secretary shall defer such date until the end of the period of time (not to exceed [three years] or such greater period as the Secretary, consistent with the needs of the Corps, may authorize) required for the individual to complete an internship, residency, or other advanced clinical training.

42 U.S.C. § 254m(b)(5)(A)(i) (1988) (emphasis added); *see also* 42 C.F.R. § 62.9. Citrin never asked the Secretary for the deferment he wanted. Since Citrin did not comply with the procedures for requesting a deferment, he clearly did not have a right to a deferment for an anesthesiology residency. Thus, the Government did not divest Citrin of a right to a deferment.

■ Citrin also contends that the Agency violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, by failing to comply with the APA's rulemaking requirements when it allegedly changed the deferment policy. The Government argues that Citrin was never entitled to the deferment he wanted and that the APA is not applicable here because the deferment rule is an interpretative rule, *see* 5 U.S.C. § 553(b)(3)(A) (1988), and relates to agency grants, *see* 5 U.S.C. § 553(a)(2) (1988). We need not address these arguments because

it is clear that the allegedly invalid rule was never applied to Citrin.

In support of his argument that the APA excuses his performance, Citrin relies on *Linoz v. Heckler,* 800 F.2d 871 (9th Cir. 1986). In *Linoz,* the plaintiffs were denied reimbursement under the Medicare Act for ambulance services. The plaintiffs challenged the Medicare regulations that precluded coverage for ambulance transportation to a hospital for the purpose of obtaining the services of a physician in a specific specialty. *Id.* at 874. This court held that the regulations were invalid at the time they were applied to deny the plaintiffs' claims because the agency did not comply with the notice and comment requirements of section 553 of the APA. *Id.* at 878.

Citrin's reliance on *Linoz* is misplaced. In *Linoz,* the plaintiffs were actually denied coverage because of the challenged regulations. In Citrin's case, however, the Government never denied him anything; he never even applied for the deferment he wanted. Moreover, the Agency offered him a de facto deferment after he had already completed his training. Thus, the Agency never took any action to deny Citrin a deferment. Whether the Agency changed its policy or failed to comply with the APA's comment and notice provisions has no relevance here because the Agency never applied the allegedly invalid deferment policy to Citrin. For the same reason, Citrin's argument that the Agency's alleged failure to comply with the Freedom of Information Act's publication provisions, 5 U.S.C. § 552(a)(1)(D), excuses his performance is also meritless.

■ C. Citrin contends that the damages provision in his contract is ambiguous and therefore violates 42 U.S.C. § 254*l*.[1] Section 254*l* requires the Secretary to provide the scholarship applicant with

> a fair summary of the rights and liabilities of an individual whose application is approved (and whose contract is accepted) by the Secretary, including in the

summary a *clear explanation* of the damages to which the United States is entitled under section 254*o* of this title in the case of the individual's breach of the contract.

42 U.S.C. § 254*l*(c)(1) (emphasis added). Section 254*o* mandates the damages set forth in the formula that was included in Citrin's contract. 42 U.S.C. § 254*o*(b)(1)(A) (1988).

> Citrin's contract states that, upon default the United States shall be entitled to recover an amount equal to three times the scholarship funds awarded, plus interest, *as determined by the formula*

$$A = 3ot\underline{\phantom{xx}} s$$
$$t$$

> in which:
>
> 'A' is the amount the United States is entitled to recover,
>
> 'o' is the sum of the amounts paid to or on behalf of the applicant *and the interest* on such amounts which would be payable if at the time the amounts were paid they were loans bearing interest at the maximum legal prevailing rate, as determined by the Treasurer of the United States,
>
> 't' is the total number of months in the applicant's period of obligated service, and
>
> 's' is the number of months of such period served by the applicant in accordance with Section 752 of the Public Health Service Act.

(Emphasis added.)

By itself, the clause "three times the scholarship funds awarded, plus interest" could be interpreted to mean that only the scholarship, not the interest, will be trebled. However, the next clause in that sentence makes it clear that damages will be calculated in accordance with the formula. The formula clearly triples the interest as well as the scholarship funds. Thus, the damages provision, read as a whole, is

---

**1.** Citrin also argues that, according to general contract principles, the allegedly ambiguous contract must be construed against the drafting party. However, since contract principles are not applicable here, *see Hatcher,* 922 F.2d at 1402; *Rendleman,* 860 F.2d at 1537, this argument has no merit.

clear enough to satisfy the requirements of section 254*l*(c)(1).

Citrin also contends that the damages provision violates his right to due process. In response, the Government argues that the damages provision is an enforceable liquidated damages clause. Because statutory principles, not contract principles, apply to the NHSC program, *Hatcher,* 922 F.2d at 1406–07; *Rendleman,* 860 F.2d at 1541–42, we will not examine the damages under the standard used to examine contractual liquidated damages clauses.[2] Instead, because the amount of damages was established by applying the formula in 42 U.S.C. § 254*o*(b)(1)(A), we will examine the damages as a statutorily prescribed penalty.

[6, 7] A statutorily prescribed penalty violates due process rights "only where the penalty prescribed is so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *St. Louis, Iron Mt. & S. Ry. Co. v. Williams,* 251 U.S. 63, 66–67, 40 S.Ct. 71, 73, 64 L.Ed. 139 (1919) (citations omitted); *see also Waters–Pierce Oil Co. v. State of Texas,* 212 U.S. 86, 111–12, 29 S.Ct. 220, 227, 53 L.Ed. 417 (1909). Given the resources necessary to find a doctor to practice in an underserved area, the damages in this case, $113,479.11 at the time the payment was due, are not so unreasonable that they violate due process.

■ In his final argument, Citrin contends that the Government violated the Truth in Lending Act, 15 U.S.C. § 1601 et seq., because his contract did not clearly inform him of the damages he would be liable for upon default. The Truth in Lending Act does not apply to the damages at issue here. The purpose of the Truth in Lending Act is "to assure a meaningful disclosure of *credit* terms." 15 U.S.C. § 1601(a) (1988) (emphasis added). The damages provision establishes the damages

due upon default; it is not a credit provision. Under the Truth in Lending Regulations, charges for default are not finance charges. *See* 12 C.F.R. § 226.4(c)(2) (1992). Therefore, the damages here are not finance charges and the Truth in Lending Act is not applicable.

The judgment is AFFIRMED.

---

**2.** Some district courts have examined the damages clauses in NHSC contracts as liquidated damages clauses. *See, e.g., United States v. Hayes,* 633 F.Supp. 1183, 1185–87 (M.D.N.C. 1986); *United States v. Swanson,* 618 F.Supp. 1231, 1242–44 (E.D.Mich.1985). Because, un-

like this court, those courts found general principles of contractual law applicable, *see, e.g., Hayes,* 633 F.Supp. at 1185–86; *Swanson,* 618 F.Supp. at 1239, those cases are not helpful to this court.