998 F.2d 1011
 84 Ed. Law Rep. 684
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
James J. LEDWITH, JR., M.D., Defendant-Appellant.
 No. 92-2613.
 United States Court of Appeals,
Fourth Circuit.
 Argued: May 5, 1993.
Decided: July 14, 1993.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. Robert R. Merhige, Jr., Senior District Judge. (CA-92-390-R)
 ARGUED: Wayne Lee Emery, WILKINS, DAVISON & EMERY, Warsaw, Virginia, for Appellant.
 Nicholas Stephan Altimari, Assistant United States Attorney, Richmond, Virginia, for Appellee.
 ON BRIEF: Richard Cullen, United States Attorney, C. Stuart Greer, Student Assistant to the United States Attorney, Richmond, Virginia, for Appellee.
 E.D.Va.
 AFFIRMED.
 Before RUSSELL and HAMILTON, Circuit Judges, and HEANEY, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 James Ledwith (Ledwith) appeals the district court's grant of summary judgment in favor of the government, arguing that genuine issues of material fact remain as to whether the National Health Service Corps (NHSC) breached its scholarship contract with him, or acted, arbitrarily, capriciously, or abused its discretion by placing him in default of his scholarship obligation. Finding no error, we affirm.
 
 
 2
 * Because this appeal involves the NHSC, it is helpful to begin our discussion with an overview of the relevant statutes before reviewing the particular facts involved in this appeal.
 
 
 3
 * The NHSC was established by Congress not to subsidize the education of health care professionals, but rather to rectify "the maldistribution of health care manpower in the United States," Rendleman v. Bowen, 860 F.2d 1537, 1539 (9th Cir. 1988), by providing "the delivery of health services in health manpower shortage areas." 42 U.S.C. § 254d(a)(2).[1] To "assure [the NHSC] an adequate supply of trained physicians, dentists, and nurses," 42 U.S.C.s 2541(a), Congress created the National Health Service Corps Scholarship Program (the Program). 42 U.S.C. § 2541. The Department of Health and Human Services was charged with the responsibility for promulgating rules and regulations necessary to implement the Program.
 
 
 4
 A medical student who chooses to participate in the Program must submit an application and sign a contract that conforms to a detailed statutory framework. Under the contract, the government provides financial assistance to scholarship recipients in the form of payment of educational expenses and a stipend. 42 U.S.C.s 2541(g)(1). In return, the scholarship recipient signs a contract promising to serve one year in a Health Manpower Shortage Area (HMSA) to which he is assigned by the Secretary of Health and Human Services (the Secretary), for each year he receives government assistance, or two years, whichever is greater. 42 U.S.C. § 2541(f)(1)(B); 254m. There are three ways a scholarship recipient can fulfill his obligation: (1) as a commissioned officer in the Public Health Service or a civilian employee of the NHSC, 42 U.S.C. § 254m; (2) in private practice in a HMSA ("private practice option"), 42 U.S.C.s 254n; or (3) as an employee of a nonfederal entity such as a state run community clinic ("private practice assignment"), 42 U.S.C.s 254n.
 
 
 5
 Under the Program, the Secretary must assign scholarship recipients to HMSAs in accordance with their written contract. 42 U.S.C. § 254m(d). A HMSA may consist of a geographical region, a population group, or a particular medical facility. 42 U.S.C. § 254e(a)(1). Graduating medical doctors in the Program cannot begin their service obligation immediately after graduating from medical school. Rather, medical doctors must complete at least one year of postgraduate training before beginning the period of service. 42 C.F.R. § 62.9(b). At the scholarship recipient's request, the Secretary must defer the service obligation for up to three years to allow the scholarship recipient "to complete an internship, residency, or other advanced clinical training." 42 U.S.C. § 254m(b)(5)(A); 42 C.F.R.s 62.9(a).
 
 
 6
 Scholarship recipients fulfill their service obligations by serving in designated HMSAs. In each year, it is not unusual that there are more HMSAs than there are scholarship recipients to fill those positions. As a result, the Secretary compiles a list of the highest priority sites.
 
 
 7
 The list is known as the HMSA Placement Opportunity List (HPOL). In 1985-86, scholarship recipients were matched to HPOL sites in a three-phase placement cycle. The first phase (Phase I), the Early Decision Alternative (EDA), ran from July 1 to October 31, 1985. During this phase, all scholarship recipients freely competed for all sites in their specialty on the HPOL by applying for specific sites. The object of Phase I was to allow the facility and the scholarship recipient to make a mutually acceptable pairing which, in theory, would result in the scholarship recipient remaining in the area after the completion of his required service. The scholarship recipients who did not locate a position in the EDA phase were then assigned to a specific state, region, the Bureau of Prisons, or the Indian Health Service (Phase II). Once assigned, the scholarship recipients were free to compete for any HPOL position open within their assigned area until April 15, 1986. Any scholarship recipient who was not matched to a site by April 15, was assigned to a specific site in order for the scholarship recipient to fulfill his or her obligation (Phase III).
 
 
 8
 If a scholarship recipient does not perform the service obligation for any reason, he becomes liable for liquidated damages equal to three times the amount of his total scholarship award, plus interest at the maximum legal rate calculated from the date of each payment. 42 U.S.C. § 254o(b)(1). The Secretary is directed by the statute to adopt regulations which "provide for the partial or total waiver or suspension of any obligation of service or payment by any individual ... whenever compliance by the individual is impossible or would involve extreme hardship to the individual and if the enforcement of such obligation with respect to any individual would be unconscionable." 42 U.S.C. § 254o(d)(2). "Compliance by a participant will be considered impossible if the Secretary determines ... that the participant suffers from a physical or mental disability ... resulting in a permanent inability of the participant to perform the service...." 42 C.F.R. § 62.12(c). In determining whether a service obligation poses an undue hardship and is unconscionable, the Secretary will consider certain factors: "(1) The participant's present financial resources and obligations; (2) The participant's estimated future financial resources and obligations; and (3) The extent to which the participant has problems of a personal nature, such as physical or mental disability ... which will intrude on the participant's present and future ability to perform as to raise a presumption that the individual will be unable to perform the obligation incurred." 42 C.F.R.s 62.12(d).
 
 B
 
 9
 Ledwith attended medical school at the Medical College of Virginia from the Fall of 1979 until his graduation in the Spring of 1983. In March 1980, Ledwith applied for a NHSC scholarship. At that time, Ledwith asserts he was given assurances that his future wife's professional needs would be given every consideration in the selection of a site and that he would not be involuntarily assigned to the Indian Health Service (IHS). Ledwith was concerned about assignment to the IHS because most of the placements in the IHS were in the Midwest and West, areas in which his future wife, an orthodontist, would not be licensed to practice orthodontics. These assurances were not consistent with the NHSC Application Information Bulletin supplied to Ledwith, which, as to a spouse's needs, provided:
 
 
 10
 The process of site matching allows individuals to discuss site locations with knowledgeable regional office staff and to do individual investigation of local schools and job opportunities relevant to each location as a part of the process of narrowing down available sites during the sitematching visit. The responsibility for identifying the needs of one's spouse and finding resources which meet those needs lies with you and your spouse. The regional office staff will attempt to assist in meeting those needs insofar as available sites and the needs of the NHSC allow.
 
 
 11
 In cases where spouses are employed in jobs or in schools or in residency programs which they do not wish to leave, available sites and the needs of the NHSC are the determinant in making assignments, but regional office staff will take individual needs into account to the degree possible.
 
 
 12
 (Joint Appendix (J.A.) 180). As to potential service assignments, the Bulletin read:
 
 
 13
 Locations for Scholarship Program participants to fulfill their service obligations will be in those designated health manpower shortage areas with the greatest need at the time of assignment. Since health manpower shortage area designations and priorities continually change, assignments cannot be made until approximately six months prior to a participants availability for service.
 
 
 14
 The NHSC will ask participants their location preferences about 1 year prior to assignment. The NHSC will attempt to match these preferences, especially when there is likelihood that participants will continue to practice in the shortage areas after their service obligations are completed. However, to comply with legislative requirements and to avoid staffing imbalances, the NHSC reserves the right to make final decisions on assignments.
 
 
 15
 Potential obligated service assignment locations include a limited number of designated health manpower shortage areas which are facilities of the Indian Health Service or Federal Prison facilities staffed by the Bureau of Medical Services.
 
 
 16
 (J.A. 171).
 
 
 17
 On August 2, 1980, Ledwith received a scholarship award for the period beginning July 1, 1980, and ending June 30, 1981. On June 12, 1981, Ledwith received a continuing scholarship award for the period beginning July 1, 1981, and ending June 30, 1982. Ledwith received a total of $20,758 from the Program. Following graduation, Ledwith's service obligation was deferred for three years to enable him to complete a postgraduate residency in family practice medicine. Upon completion, Ledwith was required to begin two years of service in the NHSC on July 1, 1986.
 
 
 18
 In July 1985, Ledwith, along with all other scholarship recipients, was mailed a placement package to assist in securing a placement in 1986. These materials stated that any scholarship recipient who did not match during the EDA phase, which concluded on October 1, 1985, would be assigned to a region, state, or program to find a placement. In preparation for the selection process, Ledwith completed a Site Selection Questionnaire on which he indicated that he preferred to work in an area in which his wife would be licensed to practice orthodontics. The areas of preference were located in the East and South, ostensibly the areas with the most intense competition among scholarship recipients. Ledwith was not successful in finding a placement during Phase I because he "did not rank high enough on [his] Site Selection Questionnaire on any of the States[he] requested in comparison with other physicians requesting the same States." (J.A. 242). As a result, on December 12, 1985, Ledwith was informed by the NHSC that he was assigned to the IHS. This led to a barrage of correspondence and communication between the parties. We will highlight the relatively important ones.
 
 
 19
 On December 17, 1985, Ledwith wrote to the NHSC asking for a statement of his financial obligation should he be placed in default status. On January 3, 1986, Ledwith wrote the NHSC to advise that he reviewed the materials from the IHS and found no sites which were suitable to him because none of them were in any states where his wife was licensed to practice orthodontics. On January 10, 1986, the NHSC gave Ledwith an accounting should he default. On January 29, 1986, Ledwith wrote the NHSC stating that if assigned to the IHS, he would not be able to meet his and his wife's financial loan obligations due to her inability to practice orthodontics. On February 3, 1986, the NHSC wrote Ledwith indicating that due to the need for doctors in the IHS he would not be transferred from the IHS. On February 13, 1986, Ledwith was informed by the NHSC that the IHS was in need of dental services and that part of the Aberdeen area of South Dakota was without orthodontic services. Ledwith was advised that his wife should consider initiating an orthodontics practice in Pine Ridge, South Dakota. That letter also summarized Ledwith's situation:
 
 
 20
 [Y]ou remain assigned to the IHS and may not fulfill your obligation in Virginia. If you are not matched by April 15, you will be site assigned by the NHSC. If you do not accept assignment, you will be placed in default of your obligation.
 
 
 21
 (J.A. 197).
 
 
 22
 Thereafter, Ledwith arranged a site visit to Pine Ridge, but canceled the visit, ostensibly due to Ledwith's view that the position in Pine Ridge would be unacceptable because the dental practice would not entail enough orthodontic work for his wife, the salary was not commensurate with his wife's experience, and the position involved travelling which would be unbearable with a small child at home.[2]
 
 
 23
 On March 13, 1986, Ledwith wrote the NHSC stating that he would not accept an assignment from the IHS or the NHSC unless his wife was able to practice orthodontics. On March 19, 1986, Ledwith called the NHSC and indicated that he wanted a reassignment from the IHS to a site in Aylett, Virginia, where he would fulfill his NHSC scholarship obligation through the "private practice option."[3] Ledwith was informed that he remained assigned to the IHS. On April 13, 1986, Ledwith wrote the NHSC and indicated that his wife could not practice orthodontics at any available site within the IHS. In conclusion, Ledwith stated: "As I see no further progress in this matter I must inform you that I do not expect to be able to fulfill my scholarship commitment with the NHSC through a position in the Indian Health Service." (J.A. 258). Shortly after this correspondence, Ledwith was notified that as of July 1, 1986, he would be considered in default of his NHSC scholarship obligation if he indeed failed to begin his service obligation as he indicated by his letters. The NHSC did not assign Ledwith to a particular position after April 15, 1986.
 
 
 24
 In June 1986, Ledwith notified the NHSC that he did not wish to be considered in default. In July, the NHSC indicated it was interested in his professional services and advised Ledwith that if he would execute a Forbearance Agreement and serve his two years, his debt would be discharged. Ledwith executed the Forbearance Agreement, but only agreed to serve within a sixty mile radius of Tappahannock, Virginia, because of his wife's orthodontics practice. The NHSC found this unacceptable, but offered to assign Ledwith to a position in an area where his wife would be licensed to practice orthodontics. Ledwith responded in a letter dated September 21, 1987, that he intended to remain where he was; however in later correspondence, Ledwith agreed to move out of Tappahannock only if it was necessary and reasonable.
 
 
 25
 In December 1987, Congress enacted a Special Repayment Program for NHSC scholarship recipients which provided an option for service equal to 150 percent of their service obligation at a site on the Supplemental HMSA Placement Opportunity List (SHPOL). On May 28, 1988, Ledwith exercised this option; however, he failed to achieve a match before the deadline and again was placed in default. On June 23, 1989, Ledwith was offered one last opportunity to execute a Forbearance Agreement. Ledwith declined.
 
 
 26
 The government filed a complaint in the United States District Court for the Eastern District of Virginia alleging that Ledwith breached his NHSC scholarship agreement in addition to breaching the Special Repayment Program agreement. On October 2, 1992, the government moved for summary judgment; on cross-motions for summary judgment, the district court granted the government's motion for summary judgment and denied Ledwith's motion for summary judgment. On November 5, 1992, the district court entered a judgment against Ledwith in the amount of $187,958.31, an amount representing $62,274.00 in principal and $125,684.31 in interest. Ledwith now appeals.
 
 II
 
 27
 Appellate review of the granting of a party's motion for summary judgment is de novo, and the court of appeals uses the same standards as the district court. Summary judgment is appropriate only if there are no genuine issues of material fact. Charbonnages de France v. Smith, 597 F.2d 406 (4th Cir. 1979). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Factual disputes that are irrelevant or immaterial are properly excluded from consideration. Id. The party seeking summary judgment has the initial burden to show absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). This burden does not require the moving party to show evidence that proves absence of a genuine issue of material fact, but only to point out its absence. Id. The responding party may not rest upon mere allegations or denials, Anderson, 477 U.S. at 248, and summary judgment is appropriate if the responding party fails to show, under Rule 56, the existence of an element essential to that party's case. Celotex, 477 U.S. at 322. A mere scintilla of evidence supporting the case is insufficient. Anderson, 477 U.S. at 252. The responding party is, however, entitled to have all reasonable inferences and questions of law resolved in his favor. Id. at 255.
 
 III
 
 28
 Ledwith initially argues that contract principles govern the interpretation of his agreement with the NHSC. This position has been uniformly rejected. See United States v. Citrin, 972 F.2d 1044, 1049 (9th Cir. 1992); United State v. Arron, 954 F.2d 249, 251 (5th Cir. 1992); United States v. Melendez, 944 F.2d 216, 219 (5th Cir. 1991); United States v. Hatcher, 922 F.2d 1402, 1406-07 (9th Cir. 1991); United States v. Rendleman, 860 F.2d 1537, 1541-42 (9th Cir. 1988). The court in Rendleman observed:
 
 
 29
 In passing the statute, Congress intended to implement certain public policy goals by conditioning receipt of scholarship aid upon compliance by the recipient with federal statutory and administrative directives. These conditions did not arise from a negotiated agreement between the parties; rather, they are provided for in the statute. Statutory intent, therefore, is more relevant to the interpretation of these conditions than of common law contract principles.
 
 
 30
 In addition, the plain language of the statute demonstrates that Congress did not intend that the contract principles gov ern the interpretation of the relationship between the Secretary and a scholarship recipient. The only terms contained in the written agreement signed by a recipient are those required by the statute-that the recipient agrees to accept the aid, that upon completion of the educational program the recipient will serve in an HMSA, and that the recipient will pay triple damages if found in default of the obligation. 42 U.S.C. § 254L(f). Other conditions that affect scholarship recipients' service, such as the designation of HMSAs, are not included in the contract, although Congress addressed those issues in the statute. Thus, the obligations of the Secretary are to be based on statutory and not contract principles.
 
 
 31
 Rendleman, 860 F.2d at 1541-42 (citation omitted).
 
 
 32
 We find this reasoning persuasive and glean no countervailing justification to reject the reasoning of Rendleman and the other courts that have embraced the notion that contract principles do not govern the resolution of controversies such as the one before us. Ledwith offers nothing persuasive. Accordingly, the contract principles relied on by Ledwith have no application to his NHSC scholarship agreement. Consequently, we must view this case under the Administrative Procedure Act. Hatcher, 922 F.2d at 1407.
 
 IV
 
 33
 Ledwith raises numerous other assignments of error, but only one merits discussion. Ledwith contends that the NHSC's actions were arbitrary, capricious, or an abuse of discretion because, in assigning Ledwith to the IHS, the NHSC ignored his spouse's needs. 5 U.S.C. § 706(2)(A). The government responds that it was under no statutory obligation to place Ledwith in a place where his wife could practice orthodontics. We believe the government has the stronger position.
 
 
 34
 The Program was created to provide adequate health care to those areas in dire need of such services. Rendleman, 860 F.2d at 1543 ("The very purpose of this Congressional program is to have new health care professionals deliver medical services to areas suffering shortages of medical personnel."). To further this clearly manifested legislative objective, Congress gave the NHSC the authority to be the final arbiter on the placement of scholarship recipients. Id. ("Congress has plainly given the Secretary the authority and discretion to make a final determination on the placement of scholarship recipients.") (citation omitted); Arron, 954 F.2d at 252 ("[T]he statutory scheme governing the NHSC scholarship program makes clear that the Secretary of HHS retains sole authority to determine how to administer the program, including site selection."). Thus, it is evident the statutory scheme is not designed to ensure that a scholarship recipient is placed in an area of his preference. Rather, given the underlying purposes of the Program, the Program is designed to give the NHSC broad and unbridled discretion in making placements. A contrary conclusion would be inconsistent with Congress' intent to cure the maldistribution of health care professionals in this country. See United States v. Duffy, 879 F.2d 192, 197 (6th Cir. 1989) ("Indeed, a diminution of the Secretary's discretion in assigning recipients would exacerbate the effect of those factors that Congress articulated as causing the geographic maldistribution of physicians.").
 
 
 35
 The information provided to Ledwith made this unequivocally clear: "However, to comply with legislative requirements and to avoid staffing imbalances, the NHSC reserves the right to make final decision on assignments." (J.A. 171) (emphasis added). In addition, the materials supplied to Ledwith made it abundantly clear that the NHSC would work with scholarship recipients in finding suitable sites and encouraged individuals to investigate job opportunities. Finally, those materials stated that the "responsibility for identifying the needs of one's spouse and finding resources which meet those needs lies with you and your spouse." (J.A. 180). Thus, Ledwith knew, before he entered the Program, that the decision on final assignments would ultimately be made by the NHSC and that it was his responsibility to find suitable employment for his wife.
 
 
 36
 From our perspective, Ledwith only wanted to fulfill his service obligation on terms he dictated. This point is most evident by the letter enclosed with his Forbearance Agreement in which Ledwith states that he would not work at a site further than sixty miles from Tappahannock, Virginia. The record reflects that the NHSC made reasonable efforts to accommodate Ledwith. After Ledwith executed the Forbearance Agreement, the NHSC responded that there were no more vacancies in Virginia, but agreed to assign him to a site where his wife could practice as an orthodontist. Ledwith ultimately did not achieve a match. Suffice it to say, based on the foregoing, we cannot conclude the NHSC's actions can be deemed arbitrary, capricious, or an abuse of discretion.
 
 V
 
 37
 We have reviewed Ledwith's additional assignments of error and find them to be without merit. Accordingly, the decision of the district court is affirmed.
 
 AFFIRMED
 
 
 [1]
 The legislative history makes this point unequivocally clear:
 The committee wishes to emphasize in the strongest possible terms that it does not view the National Health Service Corps Scholarship Program as a mechanism solely intended to subsidize health professional education. Rather, in return for substantial subsidization of the cost of education, the committee views the National Health Service Corps Scholarship Program as a means to overcome a geographic maldistribution of health professionals.
 S. Rep. No. 887, 94th Cong., 1st Sess. 201 (1975), reprinted in 1976 U.S.C.C.A.N. 4947.
 
 
 [2]
 The record is not clear whether the dental position in South Dakota would have required Mrs. Ledwith to possess a license to practice in South Dakota. In his March 10, 1986, letter, which delineated his reasons for finding his wife's proposed dental position unacceptable, Ledwith does not mention licensing as an obstacle to this position. It is conceivable that since the position was with the IHS or on a reservation, no state licensing requirements applied
 
 
 [3]
 The record reflects that the King William Community Health Center, serving northern King William and King and Queen Counties in Virginia, was removed from the HPOL in August 1985. The NHSC removed sites within King William and King and Queen Counties because sites within that area were not considered to be of sufficient high priority to warrant inclusion on the 1986 HPOL. Among the factors considered by the NHSC in determining whether to include sites within King William and King and Queen Counties on the 1986 HPOL were the specific needs of the shortage areas and the likelihood that the areas could recruit health care providers from outside the pool of obligated NHSC scholarship recipients