UNITED STATES of America, Plaintiff,

v.

Keith E. McMANUS, Defendant.

No. 1:92CV00002.

United States District Court,
M.D. North Carolina,
Durham Division.

March 11, 1994.

Judgment Filed March 31, 1994.

Gill P. Beck, Office of U.S. Atty., Greensboro, NC, for U.S.

Norman B. Smith, Seth R. Cohen, Smith, Follin & James, Greensboro, NC, for Keith E. McManus, M.D.

## MEMORANDUM OPINION

OSTEEN, District Judge.

Plaintiff United States of America ("the Government") filed this action on behalf of the National Health Services Corps ("NHSC") against Defendant Keith E. McManus, M.D. The Government seeks statutory damages for McManus' alleged default on student loans he used to finance his medical education. After empaneling a jury and hearing the evidence, this court found that no factual issues existed and discharged the jury. Before the court now on the Government's Motion for Judgment as a Matter of Law are two legal questions: (1) Did the Secretary of Health and Human Services ("the Secretary") act contrary to law in limiting McManus' placement opportunities to those locations on the Health Manpower Shortage Area/Placement Opportunity List ("HPOL")? and (2) Was the Secretary's denial of McManus' request for waiver of his service obligation or repayment obligation arbitrary or capricious?

## I. FACTUAL BACKGROUND

### A. McManus' Participation in the NHSC Scholarship Program

In 1980, McManus applied for an award under the NHSC Scholarship Program to finance his medical education at the University of North Carolina School of Medicine in Chapel Hill, North Carolina. Prior to his application, McManus was provided the official *NHSC Scholarship Program Applicant Information Bulletin.* (Gov't Trial Ex. A.) The bulletin furnished, *inter alia,* the following pertinent details: (1) Locations at which participants could fulfill their service obligation would be in those designated health manpower shortage areas ("HMSAs") [1] with the greatest need at the time of assignment, *id.* at 3, 11; (2) The NHSC reserved the right to make final decisions on assignments, *id.* at 11; (3) Assignments in the private

---

1. Effective November 16, 1990, health manpower shortage areas ("HMSAs") were renamed health professional shortage areas ["HPSAs"]. *See* Pub.L. No. 101–597 § 401(b)(1), (2) (codified as amended at 42 U.S.C. § 254d (a)(1), (2) (Supp. 1990)).

practice option ("PPO") of the NHSC Scholarship Program were limited to designated HMSAs that have priority, *id.* at 16–17; and (4) A scholarship recipient could be required to serve in an area not chosen by the recipient given the needs of the NHSC at the time of assignment, *id.* at 19.

McManus alleges that he also consulted a Public Health Service publication entitled *The Medical/Dental Student Handbook* prior to his application. From this publication, he ascertained that he could participate in NHSC's PPO program by practicing medicine privately in any approved HMSA. McManus further alleges that he then telephoned the NHSC in Rockville, Maryland, and was assured by an unidentified person that he would be able to fulfill his service obligation by serving in private practice within an HMSA in North Carolina.

On April 20, 1980, McManus signed the NHSC Scholarship Program Contract. In August 1980, the Secretary also signed the contract and awarded McManus a NHSC scholarship for the academic year 1980–81. The award was renewed for the next four academic years.[2]

Under the NHSC Scholarship Program, McManus received a total of $30,901.50, representing tuition, fees, stipends, and other reasonable costs. By accepting three full years and two partial years of support, McManus incurred a four-year service obligation.

McManus graduated from medical school in June 1985. He then requested and received three one-year conditional deferments of his service obligation in order to complete a three-year family practice residency. McManus was scheduled to begin his NHSC service obligation on or about July 1, 1988, upon completion of his residency.

During his deferment period, McManus began seeking employment in Chatham County, North Carolina. By letters dated March 9, 11, and 17, 1987, McManus submitted requests to the NHSC regional office that he be allowed to serve in either North or South Carolina. (Gov't Trial Exs. AQ–AT.) The NHSC regional office responded on March 26, 1987. McManus was informed that he could serve only at vacancies listed on the HPOL and that he would have an opportunity to match nationwide to a site on the HPOL. (Gov't Trial Ex. AU.) Again on May 4, 1987, the NHSC wrote to confirm that all placements were made from the HPOL. The letter further informed McManus that the regional office would advise him of the possibility of placing Chatham County on the HPOL. (Gov't Trial Ex. BC.) McManus was unsuccessful in having Chatham County placed on the HPOL because of the close proximity of Chatham County to major medical facilities in the vicinity of Chapel Hill, Durham, Greensboro, and Raleigh.

During the summer of 1987, McManus received the 1988 Placement Package for participation in the 1988 Placement Cycle. (Gov't Trial Exs. BE–BF.) The 1988 HPOL listed one North Carolina position (Bertie County) and two South Carolina positions (Allendale and Williamsburg Counties). None of these positions were part of the PPO program. While Chatham County, North Carolina, has been and is an HMSA, it was not and is not on the HPOL.

Also included in McManus' package was a Site Selection Questionnaire ("SSQ") which he was instructed to complete and return by August 15, 1987. The package contained information warning that scholarship recipients who failed to submit an SSQ would be

---

2. While the scholarship contract was extended and amended in each of the next four years, each contract contained language which conditioned the award such that McManus was to perform his service obligation in a manner determined by the Secretary. *See* Gov't Trial Exs. D, I, N, X, and AC.

   The court finds it necessary to note that McManus' first two contracts refer to and are governed by Section 751 of the Public Health Service Act, 42 U.S.C. § 294t, which authorizes

PPOs in HMSAs of priority only. 42 U.S.C. § 294v (a)(2)(A) (1977). However, McManus' later contracts refer to and are governed by Section 338A of the Public Health Service Act, 42 U.S.C. § 254l, which authorizes PPOs in HMSAs. 42 U.S.C. § 254n (a)(2) (1982). The court also notes that § 254n was amended again in December 1987 to authorize PPOs in HMSAs "selected by the Secretary." 42 U.S.C. § 254n (a)(2) (1988).

assigned on a random basis according to the NHSC's needs. McManus failed to submit the SSQ by the deadline or at any other time. Moreover, he was informed on several occasions after the deadline that failure to submit the SSQ would result in random placement. Thus, McManus either refused or simply failed to participate in either of the first two phases of the 1988 Placement Cycle. As a result, he was assigned in the third phase of the Placement Cycle to a location on the HPOL—Martin Medical Center in Martin, South Dakota.

McManus was notified of his placement and informed that he would be recommended for default if he failed to contact the NHSC regional office to finalize his placement in Martin, South Dakota. (Gov't Summary Judgment Ex. A–19.) Upon his failure to do so, the NHSC informed McManus that he would be in default effective July 1, 1988. Instead of reporting to South Dakota, McManus communicated to the NHSC that he had chosen to practice medicine in Chatham County, North Carolina, and requested service credit for his practice there. McManus' request was denied, and he was declared in default for breach of his scholarship obligation. (Gov't Summary Judgment Exs. A–20, A–21.) McManus subsequently requested waiver of his repayment obligation due to extreme hardship. That request was likewise denied.

### B. Damages Sought by the Government

By statute, the Government contends that McManus owes the Government liquidated damages equal to three times the total scholarship award plus interest at the maximum legal prevailing rate. 42 U.S.C. § 254o(b)(1)(A). If no payments had been made, his obligation as of March 12, 1993, included principal in the amount of $92,704.50 plus interest in the amount of $165,938.31. McManus has continued to request partial relief from his NHSC debt and, in fact, submitted a check in the amount of $60,987.74 which was received by the agency on July 21, 1989. The check was applied to the interest due on his student debt. Two offsets from the Internal Revenue Service in the total amount of $12,192.06 have also been applied to McManus' interest. Thus, this lawsuit ensued for the balance owed by McManus of $185,462.81 ($92,704.50 in principal and $92,758.31 in interest). Interest has been accruing on a daily basis.

### C. Procedural History

A jury trial was held before this court beginning May 28, 1993. During trial, the Government's Motion for Judgment as a Matter of Law was granted as to McManus' defenses of wrongful inducement and estoppel. The ruling was based on the court's determination that any reliance by McManus on certain information allegedly provided by an unidentified person responding to his call to the NHSC "800" number was unreasonable as a matter of law.[3]

---

3. McManus testified at trial that before completing his application he placed a telephone call to the NHSC "800" number in Rockville, Maryland. He did so to compare state and federal scholarship programs and to determine what, if any, HMSAs would be approved in North Carolina. McManus' recollection of the conversation was as follows:

Q. And did you ask that individual whether or not you would be able to practice in any HMSA in North Carolina?
A. [Dr. McManus] I asked him if I would be able to practice in the Carolinas, and he said as long as there were health care manpower shortage areas still available.
Q. In making the decision as to whether to go the route of the federal program or the state program, did you rely upon that statement that was given to you?
A. If we had known we would have to leave the Carolinas, we would have taken the North Carolina scholarship. I would have been will-

ing to serve in either of the Carolinas at that time.
(Partial Transcript of Jury Trial Proceeding, Testimony of Keith E. McManus, M.D., May 28, 1993.) McManus argued at trial that he relied upon that telephone conversation in making his decision to apply to the NHSC, and, thus, the Government should be estopped from pursuing their claim because of the alleged misinformation given by an unidentified NHSC agent.

The court rejected McManus' argument and found that his reliance upon the information supplied by that telephone call was unreasonable as a matter of law. In so doing, the court weighed the substance of the subject telephone conversation against the NHSC Scholarship Program Contract which McManus admittedly read before signing. The court concluded that the information given via telephone was not necessarily in contradiction to the contract. The court then determined that even if there were a contradiction, the unambiguous language of the con-

Since the trial, the parties have pursued settlement negotiations unsuccessfully. Remaining for the court's disposition are the legal questions of whether the Secretary acted contrary to law in limiting McManus' placement opportunities to those locations on the HPOL, and whether the Secretary's denial of McManus' request for waiver of his service obligation or repayment obligation was arbitrary or capricious.

## II. LEGAL BACKGROUND [4]

The NHSC was established by Congress "[f]or the purpose of eliminating health manpower shortages in health manpower shortage areas" and "to provide primary health services in health manpower shortage areas [HMSAs]." 42 U.S.C. § 254d (a)(1), (2) (1982).[5] Although subsidizing the education of health care professionals was a significant consequence of the NHSC, it was never the primary purpose. Rather, the NHSC was created "as a means to overcome a geographic maldistribution of health professionals." S.Rep. No. 887, 94th Cong., 1st Sess. 201 (1975), *reprinted in* 1976 U.S.C.C.A.N. 4947; *see also Rendleman v. Bowen,* 860 F.2d 1537, 1539 (9th Cir.1988). To further the NHSC's goals and encourage participation by trained medical professionals, Congress then created the NHSC Scholarship Program. 42 U.S.C. § 254*l*.[6]

A medical student who chooses to participate in the NHSC Scholarship Program must submit an application and sign a contract that conforms to a detailed statutory framework. *Id.* § 254*l* (b), (c). Under the contract, the Government provides financial assistance to scholarship recipients in the form of payment of tuition and other educational expenses. *Id.* § 254*l* (g)(1). In return, the scholarship recipient signs a contract promising to serve one year in an HMSA to which he is assigned by the Secretary for each year he receives government assistance, or two years, whichever is greater. *Id.* § 254*l* (f)(1)(B). There are three ways a scholarship recipient can fulfill his service obligation: (1) as a commissioned officer in the Public Health Service or a civilian employee of the NHSC, *id.* § 254m; (2) as a private practitioner in an HMSA (private practice option), *id.* § 254n; or (3) as an employee of a nonfederal entity such as a state-sponsored community clinic, *id.*

Most scholarship recipients fulfill their obligation by serving in a designated HMSA. Under the program, the Secretary must assign recipients to HMSAs in accordance with their written contract. *Id.* § 254m (d). Over the years, it became evident that there were far more HMSAs than scholarship recipients to fill those positions. As a result, the Secretary began to compile a list of the highest priority sites which became known as the Health Manpower Shortage Area/Placement Opportunity List ("HPOL").[7] The purpose

tract controlled and any reliance upon the telephone call, juxtaposed to the contract, was unreasonable. (Partial Transcript of Jury Trial Proceeding, Partial Ruling Pursuant to Rule 50 by the Honorable William L. Osteen, Sr., June 1, 1993.) *See generally United States v. Ledwith,* 805 F.Supp. 371, 374 (E.D.Va.1992) (finding NHSC recruiters have no authority to make contradictory oral statements regarding obligations under NHSC Contract), *aff'd by unpublished opinion,* 1993 WL 264576, 1993 U.S.App. LEXIS 17924 (4th Cir. July 14, 1993) *(per curiam ).* As a result, McManus' wrongful inducement and estoppel claims were dismissed, and the jury was discharged.

4. With certain changes, this overview of the relevant NHSC statute and regulations is taken in substantial part from the unpublished Fourth Circuit opinion of *United States v. Ledwith,* No. 92–2613, 1993 WL 264576, 1993 U.S.App. LEXIS 17924 (4th Cir. July 14, 1993) *(per curiam ).* While unpublished opinions are not binding precedent and their citation is disfavored, the court

sees no reason to recreate the history of the NHSC Scholarship Program when the Fourth Circuit has aptly articulated that history in a previous opinion.

5. Unless otherwise indicated, the 1982 version of the United States Code governs this lawsuit.

6. The Secretary of Health and Human Services was charged with the responsibility of promulgating rules and regulations necessary to implement the program.

7. Significantly, the HPOL has no statutory or regulatory authority from which it derives. The HPOL is a mechanism developed by the Secretary to prioritize congressionally mandated and approved HMSAs. *See United States v. Duffy,* 879 F.2d 192, 196 (6th Cir.1989); *Rendleman v. Bowen,* 860 F.2d 1537, 1543 n. 5 (9th Cir.1988). The only passing reference to the HPOL made by Congress was in the Senate Committee on Ap-

of the HPOL is to ensure that the NHSC's resources are directed toward the neediest HMSAs. (Letter from Marion A. Jordan, Acting Deputy Director, Division of the NHSC to Gill P. Beck, Assistant United States Attorney, Aug. 16, 1993, at 2.)[8]

The HPOL is used in conjunction with a three-phase placement cycle to match scholarship recipients to sites which satisfy their service obligation. During the first phase, the Early Decision Alternative, recipients compete nationally by applying for specific sites on the HPOL. The objective of Phase I is to find mutually acceptable pairings which will result in the recipient remaining at the high priority HMSA even after the service obligation is completed. If a scholarship recipient is not matched in the initial phase, the recipient is then assigned to a specific state, region, the Bureau of Prisons, or the Indian Health Service. In Phase II, the recipient may compete for any HPOL position open within his assigned area. Finally, any recipient who does not match in Phase II is assigned randomly to a specific site on the HPOL in the final phase of the placement cycle.

If a scholarship recipient does not perform the service obligation for any reason, the recipient becomes liable for liquidated damages equal to three times the amount of the total scholarship award, plus interest at the maximum legal prevailing rate. 42 U.S.C. § 254o(b)(1). However, by statute, the Secretary may "provide for the partial or total waiver or suspension of any obligation of service or payment by an individual under the Scholarship Program ... whenever com-

propriations when it considered appropriations for the NHSC for the fiscal year 1984:

> When the restriction on utilizing the PPO in areas of greatest need was removed in the Omnibus Reconciliation Act, this was interpreted to mean by some scholarship obligees that they may serve under the PPO in any Health Manpower Shortage Area (HMSA) of their choice without regard to the relative needs of the area, the placement strategy of the program, or the process for making placement. This was clearly not the intent of the legislation which eased the restrictions to bring placement of PPO's into balance with placement of Federal assignees.
>
> The Committee therefore directs that, except in unusual circumstances as determined by the Administrator, all PPO placements will only be approved if they are on the [HPOL].
>
> The Committee feels that the [HPOL] is an essential first step in targeting obligors to areas of greatest need and expects that the placement process in subsequent years will be further refined to assure that PPO and Federal placements are only approved in areas of greatest need.

S.Rep. No. 247, 98th Cong., 1st Sess. 29 (1983); *accord* H.R.Conf.Rep. 422, 98th Cong., 1st Sess. 12 (1983) (the conferees agreed that the NHSC PPO placements should be approved only if they are on the HPOL).

8. Because one of the remaining legal issues before the court is whether the Secretary acted contrary to the purpose of the statute in utilizing the HPOL to assign scholarship recipients to HMSAs, the court requested the parties to provide supplemental information regarding the creation of the HPOL. In response, the Government provided the court with a copy of a letter received from the Department of Health and Human Services, Division of National Health Service Corps, addressing the history of the HPOL. That letter provides in relevant part:

> The HPOL was created because the NHSC realized the need for a more centralized assignment mechanism to implement the placement process. The HPOL is compiled and distributed by the NHSC Central Office. Prior to the implementation of the HPOL in Fiscal Year (FY) 1984, the placement procedures varied from year to year as the Secretary of the Department of Health and Human Services (the Secretary) attempted to distribute a limited number of health professionals to the neediest shortage areas.
>
> ... Regular updates are essential to maintain the character of the HPOL so that it reflects the most current of the highest priority areas. In developing the HPOL, the NHSC solicits high priority areas and facilities within high priority HPSAs from its Regional Offices, State coordinators' offices, the Indian Health Service, and the Federal Bureau of Prisons.
>
> The HPOL provides a comprehensive list of shortage area sites available for a particular placement cycle. The purpose of the HPOL is to insure that the NHSC's resources are directed to the neediest sites within high priority HPSAs. The NHSC believes that its resources should be targeted toward assisting HPSAs which are not sufficiently attractive to independently recruit health practitioners. This goal is accomplished by restricting the placement of available scholarship practitioners only to those HPSAs which clearly have been unsuccessful in relying upon the open market for a supply of needed health manpower. While the number of designated HPSAs has remained fairly constant, the supply of scholars has fallen dramatically and increased the NHSC's need to prioritize and to send its providers to the neediest areas.

(Letter from Jordan to Beck, at 1–2.)

pliance by the individual is impossible or would involve extreme hardship to the individual and if enforcement of such obligation with respect to any individual would be unconscionable." *Id.* § 254*o* (d)(2).

Compliance by the scholarship recipient is to be determined impossible if "the participant suffers from a physical or mental disability resulting in the permanent inability of the participant to perform the service." 42 C.F.R. § 62.12(c) (1991). In determining whether a service obligation poses an extreme hardship and is unconscionable, the Secretary will consider the following factors:

(1) The participant's present financial resources and obligations; (2) The participant's estimated future financial resources and obligations; and (3) The extent to which the participant has problems of a personal nature, such as physical or mental disability, terminal illness in the immediate family which so intrude on the participant's present and future ability to perform as to raise a presumption that the individual will be unable to perform the obligation incurred.

*Id.* § 62.12(d). As with other administrative rulings, the Secretary's waiver decision is then subject to judicial review.

## III. LEGAL ANALYSIS

### A. Breach of the NHSC Scholarship Program Contract

The critical question before the court is which party has breached the NHSC Schol-

arship Program Contract. The Government contends that because McManus did not fulfill his service obligation as assigned by the Secretary, he is automatically in default of his student loans and must pay the statutory trebled damages. McManus asserts, however, that the Secretary's use of the HPOL in making assignments was contrary to law, and, consequently, the Secretary breached the contract. Because it is undisputed that McManus did not fulfill his service obligation as assigned by the Secretary, the only issue before the court is whether the use of the HPOL was contrary to law.

### 1. Standard of Review: Application of Contract or Statutory Principles

■ Because the Fourth Circuit has not spoken publicly on the NHSC statutory provisions, this court will address the labyrinth of jurisprudence debating the proper legal framework in which NHSC scholarship disputes should be analyzed. Courts are divided on the issue of whether the NHSC Scholarship Program Contract should be viewed through the prism of contract or statutory principles.[9] One of the more serious ramifications of the resolution of this question is whether contract defenses such as estoppel or repudiation may be asserted by scholarship recipients. As a result of the trial in the present matter, the contract defenses of estoppel and wrongful inducement asserted by

---

**9.** At least two cases in this district have analyzed NHSC cases under contractual principles. *United States v. Hayes,* 633 F.Supp. 1183, 1185 (M.D.N.C.1986) (noting that "when construing liquidated damages provisions in government contracts, the courts turn to general principles of contract law"); *United States v. Phillips,* No. 1:91CV00532, slip op. at 4 (M.D.N.C. Mar. 17, 1993) (observing that "[i]n interpreting the contract the court applies general contract law"). *See also United States v. Bills,* 639 F.Supp. 825, 829 (D.N.J.1986) (holding that "[i]n construing the contract in issue here we apply general contract law"), *modified on other grounds,* 822 F.2d 373 (3rd Cir.1987); *United States v. Swanson,* 618 F.Supp. 1231, 1239 (E.D.Mich.1985) (noting "the validity, interpretation and construction of contracts with the federal government ... is [sic] governed by principles of general Federal contract law").

However, until recently, the only circuit courts to address the issue have concluded that contract

principles are irrelevant in NHSC cases. *United States v. Ledwith,* No. 92–2613, 1993 WL 264576, 1993 U.S.App. LEXIS 17924, *19 (4th Cir. July 14, 1993) (per curiam) (finding "contract principles relied on by Ledwith have no application to his NHSC scholarship agreement"); *United States v. Citrin,* 972 F.2d 1044, 1049 (9th Cir. 1992) (holding "statutory principles, not contract principles, govern the relationship between the Secretary and the scholarship recipient"); *United States v. Hatcher,* 922 F.2d 1402, 1406–07 (9th Cir.1991) (same); *Rendleman v. Bowen,* 860 F.2d 1537, 1541–42 (9th Cir.1988) (same); *United States v. Arron,* 954 F.2d 249, 251 (5th Cir.1992) (observing "[w]e thus look to legislative intent, rather than use contract principles"); *United States v. Melendez,* 944 F.2d 216, 219 (5th Cir. 1991) (same); *Hahn v. United States,* 757 F.2d 581, 590 n. 8 (3rd Cir.1985) (discussing service obligation by scholarship recipient in terms of statutory provisions, rather than contract duties).

McManus are no longer available. Thus, the resolution of whether contract or statutory principles applies does not affect the outcome of this particular case.

· However, as a matter of future import in this circuit, the court notes the remarkable similarity between the two frameworks. Under either framework, the answer to the question of whether the Secretary acted *contrary to law* is dispositive of the case. Pursuant to the Administrative Procedure Act or statutory review, the court must determine if the Secretary's action were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under contract principles, the court must determine if the Secretary breached its contractual duty to "[r]elease the Applicant from all or part of his or her service obligation to enter into the full-time private clinical practice of the applicant's health profession where the provisions of section 338C of the Public Health Service Act, 42 U.S.C. § 254n and applicable Corps policies are met." (Gov't Trial Exs. N, X, and AC § A4.)

Notably, the key question under either legal framework is whether the Secretary properly followed the statutory guidelines of the NHSC Scholarship Program. Therefore, while acknowledging that the question does not weigh so heavily in this particular case, the court is of the opinion that the two legal frameworks should not necessarily be mutually exclusive. The court will proceed, however, on the premise that statutory principles and statutory intent are more relevant to this case.[10] In short, McManus signed an open-ended contract under which he and the Secretary agreed to abide by statutory di-

rectives, even though those directives were subject to change. *See American Hosp. Ass'n v. Schweiker*, 721 F.2d 170, 183 (7th Cir.1983), *cert. denied*, 466 U.S. 958, 104 S.Ct. 2169, 80 L.Ed.2d 553 (1984) (cited by analogy in *Rendleman*, 860 F.2d at 1542, the progenitor of the proposition that statutory principles are more relevant).

## 2. The Secretary's Use of the HPOL Was Not Arbitrary, Capricious, or Contrary to Law

█ The court must determine whether the Secretary's application of the HPOL in making assignments in the NHSC program was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Great deference should be given to the interpretation of a statute by the officers or agency charged with its administration. *Environmental Protection Agency v. National Crushed Stone Ass'n*, 449 U.S. 64, 83, 101 S.Ct. 295, 307, 66 L.Ed.2d 268 (1980).

### a. Section 254f(f)

█ McManus first argues that the Secretary's use of the HPOL was contrary to a policy of the NHSC codified at 42 U.S.C. § 254f(f). Section 254f(f) provided at all relevant times:[11]

In making the assignment of a Corps member to an entity in a health manpower shortage area which has had an application approved under this section, the Secretary shall seek to assign to an area a Corps member who has (and whose spouse, if any, has) those characteristics which are characteristics which increase the probability of the member's remaining to serve the

---

**10.** While this court goes so far as to say that statutory principles are more relevant than contract principles, it will not opine that contract principles are totally irrelevant. It is the court's belief that cases subsequent to *Rendleman* have expanded the proposition stated in that case. *See Rendleman*, 860 F.2d at 1541–42 (holding "[s]tatutory intent, therefore, is *more relevant* to the interpretation of these conditions than are common law contract principles") (emphasis added).

Significantly, the Seventh Circuit has most recently noted that a literal reading of *Rendleman* does not require one to conclude that contractual

principles are totally inapplicable. *United States v. Becker*, 995 F.2d 779, 783 & n. 3 (7th Cir.1993) (observing "*Rendleman* noted that ... statutory intent is *more relevant* to interpret its conditions than common-law contract principles.... This does not mean that the government and Becker did not have a contract, of course; the statute describes the scholarship agreement as a 'contract' at 42 U.S.C. § 254l (f)"). The court agrees with this analysis.

**11.** Section 254f(f) was deleted from the statute in 1990. The provision is, however, relevant to this lawsuit.

area upon completion of his assignment period.

McManus asserts that the HPOL does not factor into its equations the probability of a participating physician staying permanently in a particular area. In fact, he contends that the use of the HPOL encourages participating physicians to perform their obligation and then to abandon the HMSA for an area more amenable to the physician.

Despite the apparent logic to this argument, McManus' claim is easily dismissed in light of his own conduct. By offering a three-phase placement cycle, the agency reasonably fulfilled the command of § 254f(f). This process offers some opportunity for the participating physician to choose his location. McManus either refused or simply failed to participate in the placement cycle despite receiving the pertinent information. Moreover, McManus received additional reminders that his failure to participate in the placement cycle would result in his random placement during the third phase.

Furthermore, McManus had earlier notified the NHSC of his desire to remain in the Carolinas. The 1988 HPOL listed one North Carolina position and two South Carolina positions. McManus had the opportunity to remain in the Carolinas if he had followed proper agency procedure. The court cannot, and will not, condone McManus' blatant refusal to follow the reasonable rules of the agency. Thus, the Secretary's use of the HPOL was not antithetic to § 254f(f).[12]

### b. Section 254n

Secondly, McManus asserts that the Secretary's use of the HPOL is contrary to § 254n, which required the Secretary to approve his proposed private placement in Chatham County, North Carolina. McManus claims that the 1981 amendment to § 254n eliminated the discretion of the Sec-

retary in placing private practice physicians and broadened the private physician's options beyond high priority HMSAs. As a result, McManus challenges the Secretary's failure to release him, as well as the Secretary's subsequent application of the HPOL to assign him to a high priority HMSA. Conversely, the Government submits that § 254n does not give McManus the absolute right to private placement in the HMSA of his choice and that the Secretary retains the authority to reject McManus' proposed private placement.

From 1976 to 1981, the NHSC statutory scheme required the Secretary to limit the exercise of private placement to priority HMSAs, or HMSAs with the greatest health care shortages. 42 U.S.C. § 294v(a)(2)(A) (1977). In 1981, Congress amended the PPO provision to remove the requirement that private physicians serve only in high priority HMSAs. 42 U.S.C. § 254n(a)(2) (1982). Section 254n(a)(2) provided in relevant part:[13]

> The Secretary shall ... release an individual from all or part of his service obligation under section 254m(a) of this title ... if the individual applies for such a release under this section and enters into a written agreement with the Secretary under which the individual agrees to engage for a period equal to the remaining period of his service obligation in the full-time private clinical practice ... in a health manpower shortage area (designated under section 254e of this title).

The question which remains before the court is whether the 1981 amendment divested the Secretary of his authority to control private placements for scholarship recipients.

The case of *Fisher v. Bowen*, 659 F.Supp. 784 (D.Or.1987), answered this precise ques-

12. The court must note, however, the fact that there were no PPO positions in the southeast United States on the HPOL has given the court some pause. As a practical matter, the three-phase placement cycle will not effectively encourage physicians to stay long term in an area if they wish to remain in private practice in the Southeast. Thus, in the Southeast in 1988, the agency may not have fulfilled the congressional mandate of § 254f(f). Nonetheless, the agency must operate an entire program, not simply a

program for McManus and, as such, the Secretary is entitled to some deference.

13. Congress again amended the PPO provisions in December 1987 to explicitly allow private placement in HMSAs designated by the Secretary. 42 U.S.C. § 254n(a)(2) (1988). The current PPO provision is not directly pertinent to this case.

tion under a nearly identical factual situation. In *Fisher*, the scholarship recipient failed to match with a site on the list of approved HMSAs, and instead, insisted that she be allowed federal placement in Oregon. *Id.* at 786–87. The district court made the following findings:

> The expansion and liberalization of the private placement provisions in the 1981 amendments were a specific response by Congress to budgetary restrictions which reduced the number of federally-funded opportunities in the NHSC....

> While section 254*n* provides that the Secretary shall release an individual where the individual applies for a release and enters into a written agreement with the Secretary to engage in private clinical practice in a [HMSA], *the statute is silent as to the Secretary's obligation to enter into such a written agreement as to any proposal made by the scholarship recipient.* In light of the prior statutory scheme and the nature of the program, this court will not infer such an obligation on the part of the Secretary.

*Id.* at 788 (emphasis added). Like the *Fisher* court, this court finds there is no indication that Congress intended to strip the Secretary of his discretion and to place absolute discretion in the hands of a scholarship recipient to choose his own assignment. *Id.* at 789. Such a result would, in effect, eviscerate the statute entirely.

Perhaps more specifically than *Fisher*, McManus challenges the Secretary's use of the HPOL in making his assignment. As discussed above, the HPOL is the Secretary's compilation of the highest priority HMSAs across the country. *See supra* note 8. While it is true that the 1981 amendment eliminated the "priority" language of the PPO provisions, the court can see no indication that the amendment restrained the discretion of the Secretary to make assignments or to establish methods by which placements could be made.

First, the plain language of the statute[14] requires a "written agreement" of release between the scholarship recipient and the Secretary, with the Secretary retaining the authority to create contract provisions as necessary. 42 U.S.C. § 254*n* (b); *see also* 42 C.F.R. § 62.8(g). Naturally, it follows that the Secretary has retained his discretion in entering into a release agreement. Otherwise, every scholarship recipient could apply for and obtain release in the HMSA of his choice regardless of the facility, the need of the community, the population, the surrounding medical facilities, and other important factors that lie at the heart of the NHSC Scholarship Program. "To permit a recipient of scholarship funds to make an agreement with NHSC for such funds and then to permit the recipient to decide what service will be rendered and where it will be rendered will result in absolute chaos ... and would most certainly destroy any such program." *United States v. Gross*, 725 F.Supp. 892, 895 (W.D.La.1989) (quoting *United States v. Conway*, 686 F.Supp. 571, 572 (E.D.La.1988), *aff'd*, 868 F.2d 1269 (5th Cir. 1989)).

This case provides an excellent example of how a physician's choice of placement could defeat the essential purposes of the NHSC. McManus' private practice is in Siler City, North Carolina. While that particular area of Chatham County may have a shortage of medical personnel, within only a fifty (50) mile radius are numerous major medical facilities located in Chapel Hill, Durham, Greensboro, and Raleigh. There are other communities throughout the United States that do not have major medical facilities within hundreds of miles. This disparity indicates the necessity that the Secretary retain his release discretion under § 254*n* so that the original goals of the NHSC program are not displaced and congressional intent is not ignored. *See generally Ledwith*, 1993 WL 264576, at *7, 1993 U.S.App.LEXIS 17924, at *21.

**14.** The court readily acknowledges that the plain language of § 254*n* could be interpreted in a vacuum to allow the scholarship recipient his choice of private practice in any HMSA. The court also understands that it has a duty to apply statutes as written. However, this rule does not apply in the "rare cases [where] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982). Section 254*n* is such a statute.

Second, the legislative history of the 1981 amendment affirms that the change in the PPO provision was a budgetary consideration aimed mainly at encouraging private practice as opposed to NHSC salaried positions. *See* H.R.Rep. No. 208, 97th Cong., 1st Sess. 784, *reprinted in* 1981 U.S.C.C.A.N. 396, 1010, 1146. The report indicates that § 254n was intended to "allow[ ] the Secretary more flexibility in encouraging individuals to serve, at their financial risk, in underserved areas during the obligation period." *Id.* The report does not purport to limit the Secretary's discretion, but rather to provide him with another mechanism through which to provide health care for underserved communities.

Furthermore, albeit in an appropriation report, Congress noted its approval of the HPOL before McManus was assigned. *See supra* note 7. In fact, that report states that it "was clearly not the intent" of Congress either to grant scholarship recipients the absolute right to choose their assignment area or to restrain the Secretary's use of the HPOL in making private placements. *Id.* The committee applauded the use of the HPOL to meet the nation's growing need for health care professionals in underserved areas.

Likewise, courts have repeatedly upheld the Secretary's use of the HPOL to assign health care professionals. *Rendleman,* 860 F.2d at 1541–43; *Duffy,* 879 F.2d at 196; *Fisher,* 659 F.Supp. at 787–89. *See generally Ledwith,* 1993 WL 264576, at * 2, * 7–8, 1993 U.S.App. LEXIS 17924, at * 5, * 22 (discussing the HPOL and ultimately concluding that the scholarship recipient had been treated reasonably by the Secretary).

This court finds no reason to hold differently, particularly in light of McManus' knowledge that the NHSC Scholarship Program was based on the needs of the Secretary at the time of McManus' assignment.

The *Applicant Information Bulletin* made numerous references to this fact, as did McManus' original contract. Moreover, after his proposal to practice privately in North or South Carolina was denied, McManus was informed repeatedly by letter that failure to return the appropriate information would result in his random placement. Again, he did not cooperate despite repeated notice of the consequences. Thus, the court cannot say that the Secretary acted arbitrarily or capriciously in his handling of McManus' case— nor did the Secretary act contrary to § 254n.[15]

Consequently, the court finds that the Secretary did not breach the NHSC Scholarship Contract with his use of the HPOL to assign McManus to Martin, South Dakota. Because he failed to fulfill his service obligation in South Dakota, McManus breached the contract and lawfully was placed in default.

### B. Waiver of McManus' Service Obligation

The second issue before the court is whether the Secretary's denial of McManus' request for waiver or partial waiver of his service obligation or repayment obligation was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The court finds that it was not.

The Secretary could have fully or partially waived McManus' service obligation in South Dakota or his repayment obligation if the Secretary had found compliance with those obligations to be impossible or to involve extreme hardship or unconscionability. 42 U.S.C. § 254o(d)(2). Compliance is impossible only if McManus were physically or mentally disabled to the extent of making performance burdensome. 42 C.F.R. § 62.12(c). This provision is not applicable to McManus. Therefore, the only question is whether payment of the student debt and statutory pen-

---

**15.** Finally on the issue of the HPOL, the court notes that it is extremely difficult to declare an administrative policy contrary to law when Congress has subsequently affirmed and even codified that administrative procedure by statutory enactment. In 1990, the NHSC Scholarship Program was amended to include § 254f–1 entitled "Priorities in assignment of Corps personnel." 42 U.S.C. § 254f–1 (Supp.1990). This provision, in effect, gives a congressional stamp of approval to the use of the HPOL in making assignments. This amendment, although not enacted during relevant times in this lawsuit, lends much support to the actions of the Secretary. In fact, this provision implies that the use of the HPOL was, and is, entirely reasonable and consistent with the laws governing the NHSC.

alties would pose an extreme hardship on McManus, causing an unconscionable result.

In determining the hardship to McManus if required to begin repayment of his NHSC obligation, the Secretary balanced the following factors: (1) McManus' present financial resources and obligations; (2) his estimated future financial resources and obligations; and (3) other personal problems such as physical or mental disabilities or terminal illnesses within the immediate family which could intrude on his ability to perform. (Letter from Norris S. Lewis, M.D., Director of Division of Scholarships and Loan Repayments, to Norman Smith, Esq., Oct. 18, 1993, at 2.) *See also* 42 C.F.R. § 62.12(d). After several months and one reconsideration, the agency determined that McManus was capable of making repayment to the NHSC.

In its initial review, the agency estimated McManus' monthly income after taxes to be $6,323.00 and his personal expenses to equal $3,280.00. (Letter from Lewis to Smith, at 2.) Given those calculations as well as his potential to increase his income in the future, the agency denied McManus' waiver request.[16] *Id.* In his request for judicial review of the waiver decision, McManus challenged, *inter alia,* the agency's calculation of personal expenses. He asserted that a monthly debt of $1,584.00 was a personal loan in repayment of a combination of living expenses and a partial NHSC payment, rather than a business loan for "start-up funds." The agency then reconsidered its prior decision and allowed an additional $1,584.00 in personal monthly expenses, bringing McManus' total monthly personal expenses to $4,864.00. (Letter from Norris S. Lewis, M.D., Director of Division of Scholarships and Loan Repayments, to Norman Smith, Esq., Jan. 24, 1994, at 2.) Even with this adjustment, the agency adhered to its determination that McManus could begin making repayment of his student debt. *Id.*

■ The court must observe the deferential standard governing judicial review of agency action. Consequently, the court does not find that the Secretary's denial of McManus' request for waiver of his service or repayment obligation was arbitrary, capricious, or otherwise contrary to law. Just as evidentiary rulings are within the province of the trial court, waiver decisions are likewise within the province of the Secretary absent an abuse of discretion. *See, e.g., United States v. Arron,* 954 F.2d 249, 252 n. 4 (5th Cir.1992); *Buongiorno v. Sullivan,* 912 F.2d 504, 509 (D.C.Cir.1990); *United States v. Armstrong,* 784 F.Supp. 356, 359 (N.D.Tex. 1991); *United States v. Conway,* 686 F.Supp. 571, 573 (E.D.La.1988), *aff'd,* 868 F.2d 1269 (5th Cir.1989).

There is no evidence before the court to contradict or to question the soundness of the financial calculations performed by the agency in determining McManus' ability to repay his student debt. After generous accommodations for personal expenses, McManus has $1,459.00 available from which to apportion an amount for repayment of his NHSC debt. *See* Letters from Lewis to Smith. This result cannot be viewed as unreasonable. Consequently, the Secretary's denial of McManus' waiver request was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## IV. CONCLUSION

McManus concedes that he has neither performed his NHSC service obligation in Martin, South Dakota, nor made full repayment of the statutory damages assessed by the NHSC upon his default. Such inaction constitutes a breach of the NHSC Scholarship Program Contract. Having found the utilization of the HPOL to be in accordance with the scheme of the NHSC statutory provisions and having found the denial of McManus' waiver request to be supported by the evidence, the court now holds McManus liable for his breach. Accordingly, judgment as a matter of law will be granted to the

---

16. The third criterion is not applicable in this matter. McManus has never asserted that he had problems of a personal nature which would intrude upon his ability to serve or repay his NHSC obligation. While McManus has claimed that his father's physical condition factored in his decision to remain in North Carolina, his father's condition would not satisfy the third criterion in determining extreme hardship.

Government pursuant to Rule 50 of the Federal Rules of Civil Procedure.

Effective July 1, 1988, the NHSC declared McManus in default and he owed to the Government principal in the amount of $92,704.50 with interest accruing daily at the maximum legal prevailing rate. Payments in the amounts of $60,987.84 and $12,192.06 have been applied to the interest owed. Crediting such payments to interest due, as of March 12, 1993, McManus was indebted to the Government in the amount of $185,462.81 (principal $92,704.50 and interest $92,758.31). The court will hereby direct counsel for the Government to file an affidavit setting out the total amount, principal and interest, currently due the Government and to submit a proposed judgment on or before March 18, 1994. McManus will be given an opportunity to respond to such affidavit by March 25, 1994. In the event that the parties submit differing amounts due, the court will then determine the amount owed and enter judgment accordingly.

An order in accordance with this memorandum opinion will be filed contemporaneously herewith.

## ORDER

For the reasons set forth in the memorandum opinion entered contemporaneously herewith,

IT IS ORDERED AND ADJUDGED that Plaintiff's Motion for Judgment as a Matter of Law be granted.

IT IS FURTHER ORDERED that counsel for Plaintiff file an affidavit setting out the total amount, including interest, currently due Plaintiff and submit a proposed judgment on or before March 18, 1994. Defendant may respond by March 25, 1994.

## JUDGMENT

For the reasons set forth in the memorandum opinion entered March 11, 1994,

IT IS ORDERED AND ADJUDGED that Plaintiff United States of America have and recover from Defendant Keith E. McManus,

1. The sum of the judgment herein represents principal in the amount of $92,704.50 and inter-

M.D., the sum of Two Hundred One Thousand Eight Hundred Twenty–Five and 03/100 Dollars ($201,825.03),[1] plus interest accruing at the rate of $44.10 per day from and including March 19, 1994, up to but not including the date of judgment. Post-judgment interest on the total amount of this judgment is charged pursuant to 28 U.S.C. § 1961 at the legal rate of 4.22 percent per annum, computed daily and compounded annually from entry of this judgment until paid. Costs, to include those set forth in 28 U.S.C. §§ 1920, 1921, and 2412(a)(2), are taxed to Defendant.

est in the amount of $109,120.53.